IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MDL Docket No. 1:02-16000
Hon. Kathleen M. O'Malley

This Document Relates to
02-16010

IN RE:  COMMERCIAL MONEY CENTER, INC.
EQUIPMENT LEASE LITIGATION

**ROYAL INDEMNITY COMPANY'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST NETBANK, FSB**
**ON COUNTS I, II, III, AND VII OF**
**NETBANK'S THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
Chicago, IL  60606
Phone:  (312) 876-8000
Fax:  (312) 876-7934
        *and*
1221 Avenue of the Americas
New York, NY  10020-1089
Phone:  (212) 768-6700
Fax:  (212) 768-6800


SPIETH, BELL, MCCURDY & NEWELL
925 Euclid Avenue - Ste. 2000
Cleveland, OH 44115
Phone:  (216) 696-4700
Fax: (216) 696-2706

*Attorneys for Royal Indemnity Company*

February 25, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... II

INTRODUCTION .............................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ............................................................................. 1

    A.  The Bankruptcy Proceedings .................................................................................. 2

        1.  September 2003:  The Trustee Files His Complaint in the Adversary
            Proceeding Against NetBank, To Avoid NetBank's Interests In the Leases and
            Royal Bonds, From Their Inception ................................................................ 2

        2.  March 2005:  Through the "Global Settlement Agreement" In the Bankruptcy
            Proceedings, NetBank Receives Past and Future Lease Collections on Its Lease
            Pools. ......................................................................................................... 4

        3.  July 2007:  Final Judgment Is Entered Against NetBank, Avoiding Its Interests
            in the Royal Bonds and the Underlying Leases ............................................... 6

    B.  The Sale and Servicing Agreements ..................................................................... 7

ARGUMENT — THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO ROYAL DISMISSING
NETBANK'S THIRD AMENDED AND SUPPLEMENTAL COMPLAINT ................................ 9

    A.  Collateral Estoppel and Issue Preclusion Bar NetBank from Relitigating Facts and
        Issues Determined by the Bankruptcy Court, Upon Which Final Judgment Has
        Been Entered Against NetBank ............................................................................ 9

    B.  Because the Bankruptcy Court Determined that NetBank Has (and Had) No Interest
        in the Royal Bonds, Summary Judgment Should Be Granted Dismissing Count I
        (For Amounts Allegedly Due on the Royal Bonds), Count III (For Indemnification
        To the Extent Based Upon the Bonds), and Count VII (For Declaratory Judgment
        Relating to the Bonds) ......................................................................................... 12

    C.  Because the Bankruptcy Court Determined that NetBank Has (and Had) No Interest
        in Either the Royal Bonds or the Underlying Leases, And Because, Absent Such an
        Interest, There Can Be No Claim for Breach of the Sale and Servicing Agreements,
        Summary Judgment Should Be Granted Dismissing Count II (Breach of the SSAs),
        Count III (For Indemnification Based Upon the SSAs) and Count VII (Declaratory
        Judgment Relating to the SSAs) .......................................................................... 13

    D.  The Final Judgment Entered in the Bankruptcy Court Provides Additional Grounds
        for the Dismissal of Count IV (Fraud or Negligent Misrepresentation), Count VI
        (Breach of Fiduciary Duty), Count VIII (Promissory Estoppel), Count IX (Bad
        Faith), and Count X (Breach of Implied Covenant of Good Faith and Fair Dealing) ........ 15

CONCLUSION ............................................................................................................... 16

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Coleman*, 426 F.3d 719 (4th Cir. 2005) ...................................................................13

*Erebia v. Chrysler Plastics Products Corp.*, 891 F.2d 1212 (6th Cir. 1989) .................................10

*In re Forbes*, 372 B.R. 327 (6th Cir. B.A.P. 2007) .......................................................11

*Montana v. United States*, 440 U.S. 147 (1979) .............................................................9

*Semtek International, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001)................................11

*United States v. Cinemark USA, Inc.*, 348 F.3d 569 (6th Cir. 2003)................................9

## FEDERAL STATUTES

11 U.S.C. § 544....................................................................................................13

12 U.S.C. § 1821(d)(12) ....................................................................................10

28 U.S.C. § 157...................................................................................................10

28 U.S.C. § 1334................................................................................................10

## STATE STATUTES

California Code of Civil Procedure § 1049 ..............................................................10

## MISCELLANEOUS

18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
    *Federal Practice and Procedure* § 4433 (2007 Update) ....................................10

**ROYAL INDEMNITY COMPANY'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST NETBANK, FSB**
**ON COUNTS I, II, III, AND VII OF**
**NETBANK'S THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

Royal Indemnity Company ("Royal") respectfully submits this Memorandum of Law in

support of its Motion for Summary Judgment against NetBank, FSB ("NetBank").

## INTRODUCTION

Pursuant to this Court's Orders (02-16000 Doc. 2138; 02-16010 Doc. 57), Royal is

submitting two Memoranda of Law on its Motion for Summary Judgment against NetBank,

seeking dismissal of NetBank's Third Amended and Supplemental Complaint ("Complaint").  In

a Memorandum of Law filed February 15, 2008, Royal addressed Count IV (Fraud/Negligent

Misrepresentation), Count VI (Breach of Fiduciary Duty), Count VIII (Promissory Estoppel),

Count IX (Bad Faith), Count X (Breach of Implied Covenant of Good Faith and Fair Dealing),

and Count XII (Tortious Interference with Contract).  In this Memorandum, Royal addresses all

remaining counts:  Count I (Breach of Contract – Lease Bonds), Count II (Breach of Contract –

Sale and Servicing Agreements), Count III (Breach of Contract – Express Indemnification), and

Count VII (Declaratory Judgment re Bonds and SSAs).[1]

## STATEMENT OF UNDISPUTED FACTS

An overview of the facts relevant to Royal's Motion, relating to all counts, was set forth

in Royal's February 15, 2008 Memorandum, to which we respectfully refer the Court.[2]  The

principal facts relevant to the counts discussed in this Memorandum are reviewed briefly here —

---

[1] Count V (Conversion against Safeco) does not apply to Royal.  Count XI (Anticipatory Repudiation) has been voluntarily dismissed by NetBank.

[2] The documents relied upon in that Statement of Undisputed Facts were submitted under seal, on February 15, 2008, as exhibits 1 through 53 to the certification of Anne W. Mitchell, Esq.  The certification contains tables describing each exhibit, which are referenced and cited herein in the same manner as Royal's earlier memorandum.  One additional exhibit (exhibit 54) is attached to this Memorandum.

in some instances with additional detail not discussed in the February 15, 2008 Memorandum.

The facts relevant to the counts addressed in this Memorandum are narrow, and the

consequences clear:

- ***Final Judgment has been entered in the Bankruptcy Court holding that NetBank has no interest in the Royal Bonds.*** Principles of collateral estoppel and issue preclusion bar NetBank from contesting these facts. Because NetBank has no interest in the Royal Bonds, its claims for breach of the Bonds (Count I), indemnification rights purportedly created by the Bonds (part of Count III), and declaratory relief relating to the Bonds (part of Count VII) should be dismissed.

- ***The Final Judgment entered in the Bankruptcy Court also held that NetBank has no interest in the CMC-originated equipment leases that were the subject of the Royal Bonds.*** That Final Judgment thus left NetBank with only those interests in the leases that it received under the "Global Settlement Agreement" in the Bankruptcy Court. Principles of collateral estoppel and issue preclusion bar NetBank from contesting these facts.

- ***Even if Royal did assume obligations under the Amwest Sale and Servicing Agreements (the "Amwest SSAs")—which is disputed— such obligations were predicated upon NetBank's having an interest in the Royal Bonds and CMC-originated leases.*** Because NetBank has no interest in the Royal Bonds at all, and has no interest in the leases (except what it received under the Global Settlement Agreement), NetBank cannot claim any breach of any obligations under the SSAs. NetBank's claims for breach of the SSAs (Count II), indemnification rights purportedly under the SSAs (part of Count III) and declaratory relief relating to the SSAs (part of Count VII) should therefore be dismissed.

**A.    The Bankruptcy Proceedings**

**1.    September 2003:  The Trustee Files His Complaint in the Adversary Proceeding Against NetBank, To Avoid NetBank's Interests In the Leases and Royal Bonds, From Their Inception**

On September 4, 2003, the Chapter 7 Trustee commenced an adversary proceeding

against NetBank. (Ex. 50.) In his complaint, the Chapter 7 Trustee sought to avoid all of

NetBank's interests in the leases in the seven CMC lease pools for which bonds had been issued

in Royal's name ("Royal Bonds" or "Bonds"), and sought to avoid all of NetBank's interests in those Royal Bonds (which the Complaint called the "CMC-N Royal Bonds").  (Ex. 50.)

To set forth the relief sought with precision, the Chapter 7 Trustee's complaint defined as the "CMC-N Purportedly Transferred Assets" all assets, including the Royal Bonds and the right to receive payments under the leases, that were purportedly transferred by CMC to NetBank under the Amwest SSAs.  (Ex. 50, ¶¶ 14, 17.)  The Complaint defined as the "CMC-N Collateral" all assets in which NetBank was purportedly granted a security interest, including the CMC-originated leases contained in the lease pools.  (Ex. 50, ¶ 15.)  With those definitions, the Complaint sought sweeping relief voiding any interest of NetBank in the Bonds and leases. Thus:

- The Trustee's First Claim sought a declaration that "the CMC-N Purportedly Transferred Assets are assets of the Bankruptcy Estates" and that "NetBank did not perfect any interest in the CMC-N Purportedly Transferred Assets or the CMC-N Collateral."  (Ex. 50, ¶ 36.)

- The Trustee's Second Claim sought a declaration that "NetBank did not perfect any, and therefore has no, right, title, or interest in the CMC-N Purportedly Transferred Assets or the CMC-N Collateral."  (Ex. 50, ¶ 40.)

- The Trustee's Third Claim sought "a judgment compelling the turnover of all assets of the Bankruptcy Estates in the possession of NetBank including, without limitation, all of the CMC-N Purportedly Transferred Assets including, without limitation, the CMC-N Royal Bonds."  (Ex. 50, ¶ 42.)

- The Trustee's Fifth Claim sought a judgment avoiding any claimed interest of NetBank in the "CMC-N Purportedly Transferred Assets or CMC-N Collateral" as a voidable preference.  (Ex. 50, ¶¶ 51, 55.)

- The Trustee's Sixth Claim sought a "judgment avoiding any interests of NetBank in the CMC-N Purportedly Transferred Assets and the CMC-N Collateral, under sections 544 and 551 of the Bankruptcy Code."  (Ex. 50, ¶ 59.)

These Claims For Relief sought to avoid all of NetBank's asserted interests in these assets.  If the Chapter 7 Trustee succeeded, NetBank would have no rights in the leases and no rights in the Royal Bonds.  And as importantly, the Trustee's Claims were not limited simply to future payments or benefits that might be received under the CMC-originated leases, or future claims that might be made under the Bonds; his Claims included all rights under the leases and Bonds from the time of the original purported transfers to NetBank from CMC—dating back to 1999-2000 in the case of leases, and to on or about January 2, 2001, in the case of the Royal Bonds.  That much is clear from the definition of "CMC-N Purportedly Transferred Assets" set forth in the Trustee's complaint, which included not only the "contractual right to receive certain scheduled payments due under [each] CMC-N Lease Pool" but also "the proceeds derived from the foregoing."  (Ex. 50, ¶ 14.)

**2.      March 2005:  Through the "Global Settlement Agreement" In the Bankruptcy Proceedings, NetBank Receives Past and Future Lease Collections on Its Lease Pools.**

In March 2005, while the adversary proceeding against NetBank was pending, the Chapter 7 Trustee entered into a "Global Settlement Agreement" ("GSA") with all of the banks (including NetBank) and all of the sureties (including Royal) in the CMC case.  (Ex. 49.)

The GSA made clear that the Trustee would continue to pursue his adversary proceeding against NetBank, and would continue to seek all of the relief described above, sought in the Trustee's First, Second, Third, Fifth, and Sixth Claims—avoiding any interest of NetBank in the leases and Royal Bonds.  However, as part of the GSA, NetBank, Royal, and the Trustee agreed who would receive the actual lease collections from those seven lease pools—and that that distribution of collections would remain undisturbed, regardless of the result of the adversary proceeding.  That meant that if the Trustee prevailed in the adversary proceeding, NetBank would not be entitled to any lease collections by virtue of its original transactions with CMC, but would be entitled to keep what it received under the GSA.

The GSA thus provided:

> Other than the Fourth, Eighth, Ninth, Tenth, and Eleventh Claims for Relief, the Trustee shall continue to prosecute the remaining Claims for Relief in the NetBank Adversary Proceeding (the "Remaining Claims") and any resulting appeals.  The Trustee, Royal, and NetBank each expressly agree that any ruling, order, judgment, decree, or other determination made with respect to the Remaining Claims in the NetBank Adversary Proceeding, including the NetBank Decision, shall not affect the rights of Trustee, Royal and NetBank to funds disbursed pursuant to paragraphs 4(d)(ii) and 4(e) and the Assigned Contested Lease Pool Assets assigned to NetBank pursuant to paragraph 4(f)(i).

(Ex. 49, ¶ 8(c).)

The GSA provided this disposition of the actual lease collections:  NetBank was permitted to retain all past collections that it had received.  The collections that were held by the Chapter 7 Trustee (*i.e.,* those monies that had been collected during the three years that CMC had been in bankruptcy) were divided among the Trustee, Royal, and NetBank.  The Trustee was paid $100,000.  Royal was paid $2,898,207—in effect, a refund of the balance of the monies that Royal had paid to the Trustee as part of the Amended and Restated Royal-Trustee Agreement.

NetBank was paid the balance of the collections, and assigned all future lease collections.  (Ex. 49, ¶ 4(d)(ii).)

> **3.      July 2007:  Final Judgment Is Entered Against NetBank, Avoiding Its Interests in the Royal Bonds and the Underlying Leases**

On July 3, 2007, the Bankruptcy Court entered Final Judgment in favor of the Chapter 7 Trustee on each of the First, Second, Third, Fifth and Sixth Claims For Relief ("Final Judgment").  (Ex. 52.)  The findings of fact and conclusions of law underlying the Final Judgment were set forth in a Written Decision of the Bankruptcy Court, dated June 6, 2007.  (Ex. 51.)  All of the Claims in the Trustee's complaint that were not disposed of by summary judgment in the Final Judgment were dismissed by Stipulation, and an Order was entered thereon on August 3, 2007.  (Ex. 53.)

The Final Judgment granted all of the relief sought by the Trustee on the First, Second, Third, Fifth and Sixth Claims, simply stating:

> Final Judgment is hereby entered in favor of the Trustee and against NetBank on the First, Second, Third, Fifth, and Sixth Claims for Relief stated in the Trustee's Complaint.

(Ex. 52, ¶ 1.)  Thus, the Trustee was granted judgment with the full breadth of relief sought in those claims *as **"stated in the Trustee's Complaint."***  *Id*. (emphasis added).

As set forth above, the Claims For Relief asserted by the Chapter 7 Trustee and adjudicated by the Final Judgment were sweeping.  As a result of the Final Judgment, NetBank was stripped of all right, title and interest to the Royal Bonds.  Also as a result of the Final Judgment, NetBank was stripped of all right, title, and interest to the CMC-originated equipment leases that were the subject of those Bonds—thus leaving NetBank only with those rights under the leases that it had already received as part of the GSA.

- 6 -

**B.**     **The Sale and Servicing Agreements**

In this MDL proceeding, NetBank claims—in Count II and portions of Counts III and VII—that Royal agreed to assume Amwest's contractual obligations as "Servicer" under, and pursuant to all the various other terms and conditions of, the Amwest SSAs.  Royal denies those allegations, and because of the numerous disputed issues of fact involved, that issue cannot be resolved by Motion.[3]  However, for the following reasons, those disputed facts are not material to a resolution of this motion for summary judgment on all of NetBank's claims relating to the Amwest SSAs.

The Amwest SSAs make it clear that the SSAs have no independent purpose separate and apart from the existence of rights and interests to leases and bonds.  The very title—"Sale and Servicing Agreement"—plainly connotes as much.  The twin, basic purposes of that Agreement were to effectuate a supposed "sale" of lease assets by CMC and create a framework for the subsequent "servicing" of those leases.  Thus, under each of the Amwest SSAs,[4] Amwest was designated "Servicer," and the Amwest SSAs set forth certain obligations of the "Servicer" running in favor of the "Purchaser."  Each obligation of the "Servicer" was dependent upon a "Purchaser" having acquired rights to, and interests in, leases and bonds that are the subject of the SSAs.

---

[3] It is worth noting at this point, however, that each of the SSAs that Royal supposedly "assum[ed]" detailed (at Section 7.2) numerous steps that must be taken for that to occur, including, among others, (i) execution of "an agreement of assumption" between Amwest and Royal; (ii) "notice of … succession" by Amwest to NetBank and CMC; and (iii) delivery by Amwest to NetBank and CMC of "a certificate of a Responsible Officer of the Servicer and Opinion of Counsel," confirming that Amwest had not breached any "representation or warranty made pursuant to Section 3.6" of the SSA, and that "all financing statements and continuation statements … have been executed and filed."  (Ex. 54.)  None of these steps took place.

[4] The Amwest SSAs were annexed to NetBank's Complaint as exhibits 19-25 thereto.  These Amwest SSAs are in all pertinent respects identical to each other.  The Amwest SSA for CMC Lease Pool 1999-1-1a, dated March 18, 1999, is attached as Exhibit 54.

The operative ten Articles within every SSA only become operative if there has been a transfer or conveyance of leases or interests in leases from CMC to NetBank.  Thus, for example, Article II of the SSAs—titled "Conveyance of Leases, Closing and Termination"—addressed the purported "sale" of leases by CMC to NetBank.  Article III, titled "Administration and Servicing of Leases," and Article IV—"Collections, Deposits, Purchaser's Accounts, Disbursements and Releases"—all dealt with the numerous lease administration matters, including the collection of payments made by lessees and transference of those funds to NetBank.  (Ex. 54.)

Several specific SSA sections reinforce the obvious point that the SSAs and the obligations of the "Servicer" (in this case Amwest and allegedly Royal) thereunder do not, and cannot, inure to the benefit of a "Purchaser" (in this case NetBank) who does not own or possess any rights or interests in or to leases or bonds.  For example, Section 2.2 designated the Servicer as "custodian and bailee for the Purchaser" to hold the lease files and sets forth a number of particulars relating to the manner in which that is to be accomplished.  Section 3.1 "authorized and directed" the Servicer to "manage, service, administer, and make collections on the Leases."  Section 3.3 required the Servicer to take various specific steps when a "Lease becomes a Defaulted Lease," including "collect[ing] the proceeds in respect of the Surety Bond."  Section 4.1 provided that "the Servicer shall establish the Collection Account" to hold lease collections.  Section 4.7 provided that the Servicer shall distribute funds "from the Collection Account."  Finally, Section 9.4 embodied the obvious point that servicing obligations do not exist where there is nothing to service.  That section provided that where leases subject to the SSA were substituted for leases previously conveyed—thus divesting the Purchaser of all interest therein— "the Servicer's obligations hereunder … shall cease."  (Ex. 54.)  Each of these tasks—

maintaining lease files, collecting on leases, making bond claims, distributing collections—is

devoid of meaning if the Purchaser has no interest in leases or bonds.

ARGUMENT

—

THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO ROYAL
DISMISSING NETBANK'S THIRD AMENDED AND SUPPLEMENTAL
COMPLAINT

The collateral estoppel and issue preclusive effects of the Final Judgment entered by the

Bankruptcy Court mandate dismissal of Counts I, II, III and VII of NetBank's Complaint.

**A.  Collateral Estoppel and Issue Preclusion Bar NetBank from
Relitigating Facts and Issues Determined by the Bankruptcy Court,
Upon Which Final Judgment Has Been Entered Against NetBank**

Well-established principles of collateral estoppel—specifically issue preclusion—prevent

NetBank from avoiding here the plain effect of the Bankruptcy Court's ruling and Final

Judgment.  *Montana v. United States*, 440 U.S. 147, 153 (1979) ("Under collateral estoppel, once

an issue is actually and necessarily determined by a court of competent jurisdiction, that

determination is conclusive in subsequent suits…").

The Sixth Circuit has established a simple, four-part test for determining whether and

when collateral estoppel bars relitigation of an issue.  As discussed in *United States v. Cinemark

USA, Inc.*, 348 F.3d 569, 583 (6th Cir. 2003), an issue from a prior proceeding is precluded from

being relitigated where (i) it was "raised and actually litigated in the prior proceeding," (ii)

resolution of the issue was necessary "to the outcome of the prior proceeding," (iii) the earlier

litigation resulted "in a final judgment on the merits," and (iv) the party against whom estoppel is

sought, "had a full and fair opportunity to litigate" the issue in the prior proceeding.  *Id.*  All of

those requirements are met here—as is plainly evident from the Written Decision and Final

Judgment of the Bankruptcy Court.  And although the Final Judgment has been appealed by

NetBank to the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP"),[5] that appeal in no

way diminishes the "finality" of the Bankruptcy Court's judgment for collateral estoppel

purposes.  18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice*

*and Procedure* § 4433 (2007 Update) (In federal courts, "the preclusive effects of a lower court

judgment cannot be suspended simply by taking an appeal that remains undecided"); *Erebia v.*

*Chrysler Plastics Products Corp.*, 891 F.2d 1212, 1215 n.1 (6th Cir. 1989) ("[T]he established

rule in the federal courts is that a final judgment retains all of its preclusive effect pending

appeal," citing Wright, Miller & Cooper, *supra*.)

When Royal raised this issue on its request for leave to file this motion for summary

judgment, NetBank argued, in reliance upon the California Rules of Procedure, including

California Code of Civil Procedure, § 1049, that under California law, a final judgment does not

have preclusive effect during the pendency of an appeal.  NetBank's response completely

misapprehended the nature of the "Final Judgment" that was entered by the Bankruptcy Court.

The Chapter 7 Trustee's complaint against NetBank in the Bankruptcy Court proceedings that

led to the Final Judgment asserted jurisdiction over NetBank pursuant to 28 U.S.C. §§ 157 and

1334.  (Ex. 50, ¶ 1.)  These are federal question jurisdictional provisions.  No part of that

proceeding was based on diversity of citizenship.

The California Rules of Procedure, including California Code of Civil Procedure, § 1049,

relied upon by NetBank, do not govern or define the limits of federal bankruptcy court

---

[5] Following the filing of NetBank's appeal to the BAP, on September 28, 2007, the Office of Thrift
Supervision ("OTS") closed NetBank, and appointed the Federal Deposit Insurance Corporation
("FDIC") as Receiver.  On October 16, 2007, the FDIC, as Receiver moved to be substituted in place of
NetBank on the appeal, and also exercised its statutory right to be granted a stay for ninety days from the
date upon which NetBank was placed into receivership.  12 U.S.C. § 1821(d)(12).  The stay expired
December 27, 2007 and no further stay has been sought.  The FDIC, as Receiver, filed its brief in the
BAP on February 15, 2008.  The Trustee's brief is due March 31, 2008.  No date has been set for oral
argument.

judgments applying federal bankruptcy law, as the Final Judgment did here, just because the Bankruptcy Court is located in San Diego, California.  Indeed, *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001), relied upon by NetBank, makes that abundantly clear.  In *Semtek*, the underlying judgment urged as the basis for issue preclusion was entered by a federal court *sitting in diversity* and applying the law of California.  The diversity distinction was critical.  *Semtek* held that the claim-preclusive effect of the order of a California federal court whose jurisdiction was based on diversity of citizenship is the same as "the law that would be applied by state courts in the State in which the federal diversity court sits."  531 U.S. at 508.  But, as *Semtek* also made clear, state law cannot dictate the scope or parameters of federal court judgments in federal question cases by imposing "whatever effect [the States] would give their own judgments, but must accord them the effect that this Court prescribes."  *Id*. at 507.  In the case of federal judgments rendered by federal courts adjudicating questions of federal law, the pendency of an appeal does not delay the issue-preclusive effects of such judgments.

The other authority cited by NetBank is similarly off-point.  In *In re Forbes*, 372 B.R. 327, 336-37 (6th Cir. B.A.P. 2007), the Sixth Circuit Bankruptcy Appellate Panel was asked to give preclusive effect to a judgment entered by a California state court applying California law.  The B.A.P. properly recognized that it could not do so if an appeal was pending.

The judgments asserted as the basis for issue preclusion in both *Forbes* and *Semtek* do not in any way resemble the Final Judgment entered by the Bankruptcy Court, applying federal bankruptcy law, which is the basis for Royal's collateral estoppel claim here.

Under federal law, the Final Judgment and the preclusive effects of the rulings embodied therein, can and should be considered by this Court now, and need not await the final disposition of the appeal from the Final Judgment.

**B.**    **Because the Bankruptcy Court Determined that NetBank Has (and Had) No Interest in the Royal Bonds, Summary Judgment Should Be Granted Dismissing Count I (For Amounts Allegedly Due on the Royal Bonds), Count III (For Indemnification To the Extent Based Upon the Bonds), and Count VII (For Declaratory Judgment Relating to the Bonds)**

Count I of the NetBank Complaint alleges that Royal breached contract obligations to NetBank expressly created by the Royal Bonds.  Count III of NetBank's Complaint, although not entirely clear, apparently seeks, in part, to enforce indemnification rights purportedly created by the Bonds.  Count VII seeks, in part, declaratory relief regarding Royal's "past and continuing obligations under" the Bonds.

Each of these Counts is directly barred by the Final Judgment.  As noted above, the Final Judgment stated simply:

> Final Judgment is hereby entered in favor of the Trustee and against NetBank on the First, Second, Third, Fifth, and Sixth Claims for Relief stated in the Trustee's Complaint.

(Ex. 52, ¶ 1.)  Those Claims, individually and collectively, upon which the Trustee was granted Final Judgment make clear that NetBank has no interest in the Royal Bonds.  Thus, the Trustee's Second Claim sought a declaration, which the Final Judgment granted, that "NetBank did not perfect any, and therefore has no, right, title, or interest in the CMC-N Purportedly Transferred Assets or the CMC-N Collateral"—a category of assets that indisputably included the Royal Bonds.  (Ex. 50, ¶ 40.)  The Trustee's Third Claim sought a judgment, which the Final Judgment granted, "compelling the turnover of all assets of the Bankruptcy Estates in the possession of NetBank including, without limitation, all of the CMC-N Purportedly Transferred Assets including, without limitation, the CMC-N Royal Bonds."  (Ex. 50, ¶ 42.)  The Trustee's other claims reinforced the conclusion that NetBank has no interest in the Royal Bonds.  All of Count I, and so much of Counts III and VII that relate to those Bonds, should be dismissed.

**C.**  **Because the Bankruptcy Court Determined that NetBank Has (and Had) No Interest in Either the Royal Bonds or the Underlying Leases, And Because, Absent Such an Interest, There Can Be No Claim for Breach of the Sale and Servicing Agreements, Summary Judgment Should Be Granted Dismissing Count II (Breach of the SSAs), Count III (For Indemnification Based Upon the SSAs) and Count VII (Declaratory Judgment Relating to the SSAs)**

Count II and part of Count III of NetBank's Complaint allege breach of contract claims against Royal under the various Amwest SSAs.  Count VII seeks declaratory judgment relating, in part, to the same Amwest SSAs.

These Counts present a simple question:  ***With no rights in the CMC-originated leases, and no rights in the Bonds, can NetBank be left with any claims under the SSAs?***  The answer is "no."

Although the Final Judgment stripping NetBank of all rights, title and interest in CMC-originated leases and Royal Bonds was issued in July 2007, the legal effect of that Final Judgment effectively was to divest NetBank of rights in those assets as if such rights never were conveyed in the first place.  That precisely was the relief sought by the Trustee, all of which was fully awarded in the Final Judgment.  Indeed, that is the breadth of relief that necessarily follows as matter of law upon the successful prosecution of an avoidance action pursuant to Section 544 of the Bankruptcy Code, 11 U.S.C. § 544—among the code provisions relied upon by the Chapter 7 Trustee in his action against NetBank.  (Ex. 50.)  When a transfer is avoided under Section 544, it is "'render[ed] void,'" *i.e.*, made "of no effect" and "invalidate[d]."  *In re Coleman*, 426 F.3d 719, 726-27 (4th Cir. 2005) (citations omitted).

Thus, even assuming for purposes of this Motion, that Royal had agreed to succeed to Amwest's obligations under the Amwest SSAs, Royal's contractual ability to assume such obligations necessarily was dependent upon NetBank having legal rights, title and interest in underlying leases and Royal Bonds.  As a result of the Final Judgment, however, NetBank has no

such interests and, as a matter of law, ***never had such interests***.  Without such rights to, or interest in, leases and Bonds—the only reason for the SSAs in the first place—there was nothing for Royal to service.  Simply put, NetBank cannot sue Royal under Amwest SSAs where it has no interests in leases or Bonds, even assuming it otherwise might have proceeded on such contract claims had it not been stripped of those rights and interests by the Bankruptcy Court.

Moreover, even if that were not the case, several of the separately asserted SSA breaches alleged in Count II and Count III make no sense because they all purport to place upon Royal contract duties that arose—if they arose at all—well before any date in early 2001 by which Royal conceivably could have succeeded to Amwest's contractual obligations under the Amwest SSAs.  (Complaint, ¶ 114.)  For example, Royal's alleged "failure to underwrite and ensure" leases (all entered into, and acquired by NetBank, before Royal Bonds were ever issued) (Complaint, ¶ 114(a)), Royal's alleged "failure to underwrite the background and operations of CMC" (with whom NetBank began doing business nearly two years before Royal's first involvement) (Complaint, ¶ 114(b)), and Royal's alleged "failure to file or ensure the filing of UCC financing statements" (in connection with leases purportedly transferred to NetBank months—and in some instances more than a year—before Royal's first involvement) (Complaint, ¶ 114(c)), all involve alleged SSA obligations that were well beyond Royal's ability to undertake because of the passage of time between NetBank's original involvement with CMC beginning in early 1999, and Royal's original involvement with NetBank, beginning in January 2001.

A number of other specific alleged SSA breaches relate to alleged failures of Royal to collect, pay or remit sums due or collected on leases.  (Complaint, ¶¶ 114(e), (f), (g), (i).)  Of course, none of those claims can proceed in light of the Final Judgment holding that NetBank has

no rights, and never had rights, to the CMC-originated leases and Royal Bonds on which its
Complaint against Royal is based.

The SSAs clearly contain no independent obligation— divorced from leases or bonds—to
make any payments to NetBank.  Nor is any such obligation even alleged.

Having been adjudicated to be without any legal rights to, or interest in, CMC-originated
leases and Royal Bonds, NetBank's SSA claims necessarily fail as a matter of law.

**D.      The Final Judgment Entered in the Bankruptcy Court Provides
         Additional Grounds for the Dismissal of Count IV (Fraud or
         Negligent Misrepresentation), Count VI (Breach of Fiduciary Duty),
         Count VIII (Promissory Estoppel), Count IX (Bad Faith), and Count
         X (Breach of Implied Covenant of Good Faith and Fair Dealing)**

In its February 15, 2008 Memorandum, Royal set forth the reasons why—independent of
the Final Judgment entered in the Bankruptcy Court—Royal should be granted summary
judgment dismissing Count IV (Fraud or Negligent Misrepresentation), Count VI (Breach of
Fiduciary Duty), Count VIII (Promissory Estoppel), Count IX (Bad Faith), and Count X (Breach
of Implied Covenant of Good Faith and Fair Dealing).  The Final Judgment presents additional
grounds for granting Royal summary judgment on each of those counts, for the simple reason
that each of those counts is premised on NetBank having valid and binding interests in the CMC-
originated leases and Royal Bonds.  Thus, for example:

- NetBank alleges, as part of Count IV (Fraud or Negligent Misrepresentation),
  that it "retained" its interests in the CMC lease pools because of alleged
  misrepresentations by Royal.  Because the Final Judgment held that NetBank
  does not have, and never had, a valid interest in the lease pools, NetBank's
  claim that it "retained" such an interest because of something Royal said or
  did necessarily fails.

- NetBank alleges in Count VI (Breach of Fiduciary Duty) that Royal breached fiduciary duties in connection with the Royal Bonds.  Even if a commercial surety relationship could give rise to a breach of fiduciary duty claim—it cannot—certainly there can be no breach of fiduciary duty claim, grounded in a commercial surety relationship, when there is no surety relationship.  The Final Judgment's holding that NetBank has no interest in the Royal Bonds thus negates this claim.

- NetBank alleges in Counts IX (Bad Faith) and X (Breach of Implied Covenant of Good Faith) that Royal engaged in bad faith in connection with the Royal Bonds and Amwest SSAs.  Even if such bad faith claims could be grounded in a commercial surety bond or a commercial contract—they cannot—because the Final Judgment bars NetBank's Bond and SSA claims, so too does it bar claims of bad faith predicated on the Bonds and SSAs.

The Final Judgment thus provides additional reasons why each of these claims fails.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Royal's February 15, 2008 Memorandum, all of the claims against Royal in NetBank's Third Amended and Supplemental Complaint should be dismissed in their entirety.

Dated: February 25, 2008

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

/s/ Steven L. Merouse

John I. Grossbart
*jgrossbart@sonnenschein.com*
Steven L. Merouse
*smerouse@sonnenschein.com*
Anne W. Mitchell
*amitchell@sonnenschein.com*
7800 Sears Tower
Chicago, IL  60606
Phone:  (312) 876-8000
Fax:  (312) 876-7934

Michael H. Barr
*mbarr@sonnenschein.com*
Richard M. Zuckerman
*rzuckerman@sonnenschein.com*
1221 Avenue of the Americas - 23rd Floor
New York, NY  10020-1089
Phone:  (212) 768-6700
Fax:  (212) 768-6800

SPIETH, BELL, MCCURDY & NEWELL
Timothy G. Warner
925 Euclid Avenue  - Ste. 2000
Cleveland, OH 44115
Phone:  (216) 696-4700
Fax: (216) 696-2706

*Attorneys for Royal Indemnity Company*

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2008, a copy of the foregoing

**ROYAL INDEMNITY COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST NETBANK, FSB ON COUNTS I, II, III, AND VII OF NETBANK'S THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

/s/ Steven L. Merouse

John Grossbart
*jgrossbart@sonnenschein.com*
Steven L. Merouse
*smerouse@sonnenschein.com*
7800 Sears Tower
Chicago, IL  60606
Phone:  (312) 876-8000
Fax:  (312) 876-7934

Michael H. Barr
*mbarr@sonnenschein.com*
Richard M. Zuckerman
*rzuckerman@sonnenschein.com*
1221 Avenue of the Americas
24th Floor
New York, NY  10020-1089
Phone:  (212) 768-6700
Fax:  (212) 768-6800

*Attorneys for Royal Indemnity Company*