IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY CENTER, INC., EQUIPMENT LEASE LITIGATION | ) ) ) ) ) ) ) | CASE NO. 1:02cv16000 (MDL Docket) JUDGE KATHLEEN M. O'MALLEY MAGISTRATE JUDGE VECCHIARELLI MDL No. 1:02-16010 |

**RESPONSE OF FEDERAL DEPOSIT INSURANCE CORPORATION AS
RECEIVER FOR NETBANK FSB TO ROYAL INDEMNITY COMPANY'S
MOTION FOR SUMMARY JUDGMENT AS TO COUNTS IV, VI, VIII, IX, X AND XII
OF THE THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

William V. Custer
Georgia Bar No. 202910
LeeAnn Jones
Georgia Bar No. 402240
Jennifer B. Dempsey
Georgia Bar No. 217536
Powell Goldstein LLP
One Atlantic Center, Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
(404) 572-6600
bcuster@pogolaw.com

Robert B. Bernstein
Vandenberg & Feliu, LLP
110 East 42nd Street, Suite 1502
New York, NY 10017
(212)763-6804
rbernstein@vanfeliu.com

*Attorneys for Federal Deposit Insurance
Corporation as Receiver for NetBank, FSB*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS ......................................................................... 2

    A.  A Summary of the CMC Opportunity to Royal............................... 2

    B.  The Underwriting of the CMC Equipment Lease Program ............. 3

    C.  Royal Issues Bonds on the Amwest Pools of Leases...................... 4

    D.  The Importance of the Bonds to NetBank ...................................... 7

    E.  Royal Assumed the Responsibility of Servicing the Leases Under the SSAs When it Issued the Bonds .................................................. 7

    F.  Royal's Duties as Servicer are set out in the SSAs...................... 10

    G.  The Cessation of Royal's Participation in the CMC Program ...... 12

    H.  NetBank Files Its Claim Against Royal........................................ 13

    I.  Royal Abdicates its Duties as Agent and Servicer....................... 14

III.   ARGUMENT AND CITATION TO AUTHORITY.............................. 14

    A.  Georgia Law Applies to NetBank's Claims................................. 14

    B.  The Record Demonstrates that NetBank Justifiably Relied on Royal's Misrepresentations .......................................................... 14

    C.  Royal's Attempt to Limit NetBank's Damages Should be Rejected ......................... 17

    D.  NetBank's Claim for Breach of Fiduciary Duty (Count VI). ...... 17

        1.  Factual Issues Regarding the Creation of an Agency Relationship Would Preclude Summary Judgment ...................... 19

        2.  Royal's Effort to Strip NetBank of Its Rights to the Royal Bonds in the CMC Bankruptcy is, In and Of Itself, A Breach of Fiduciary Duty........................ 20

    E.  Royal's "Bad Faith" in its Role as a Surety and as a Servicer/Agent........................ 21

    F.  Royal's Breach of Implied Covenant of Good Faith and Fair Dealing ..................... 22

    G.  NetBank's Claim for Tortious Interference with Contract (Count XII) .................... 24

        1.  The NetBank/Lakeland–Trustee Agreement Was a Binding Contract........... 24

        2.  Royal's Tortious Conduct Was Not Privileged ............................. 27

IV.    CONCLUSION.......................................................................................... 28

**Appendix A** ........................................................................................................ 1

# TABLE OF AUTHORITIES

## CASES

Ades v. Werther,  567 S.E.2d 340, 344 (Ga. Ct. App. 2002)......................................................... 16

Alliance Mortgage Co. v. Rothwell,
44 Cal.Rptr.2d 352, 360 (Cal.,1995)............................................................................. 16

Am. Global Dev. Group, Inc. v. Sasser & Weatherford, Inc.,
548 S.E.2d 465, 468 (Ga. Ct. App. 2001)..................................................................... 20

Arrow Exterminators, Inc. v. Zurich Amer. Ins. Co.,
136 F.Supp. 2d 1340 (N.D. Ga. 2001) ......................................................................... 24

Artzner v. A & A Exterminators, 531 S.E.2d 200, 206 (Ga. Ct. App. 2000) ............................. 22

AT & T Corp. v. Prop. Tax Svs., Inc.,
655 S.E.2d 295, 300 (Ga. Ct. App.,2007)..................................................................... 18

Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.,
713 F.2d 618, 621 (11th Cir. 1983) ............................................................................ A-3

Bienert v. Dickerson, 624 S.E.2d 245, 248-49 (Ga. Ct. App. 2005) .......................................... 19

Bloodworth v. Bloodworth, 579 S.E.2d 858, 862 (Ga. Ct. App. 2003)....................................... 19

Cal. Viking Sprinkler Co. v. Pac. Indem. Co.,
29 Cal. Rptr. 194 (Cal. App. 1963)............................................................................... 20

Cates Constr., Inc. v. Talbot Partners, 980 P.2d 407, 424-425 (Cal. 1999)............... 18, 19, 21, 22

Crane v. Albertelli, 592 S.E.2d 684, 685 (Ga. Ct. App. 2003) .................................................... 26

Dealertrack, Inc. v. Huber, 460 F. Supp.2d 1177, 1183 (C.D. Cal. 2006)................................... 22

Delancy v. St. Paul Fire & Marine Ins. Co., 947 F.2d 1536, 1545-47 (11th Cir. 1991).............. 24

Della Penna v. Toyota Motor Sales, U.S.A., Inc.,  11 Cal.4th 376, 393 (Cal. 1995) .................. 26

Eddy v. Sharp, 245 Cal. Rptr. 211, 214 (Cal. Ct. App. 1988) ..................................................... 19

Emke v. Company, LLC, 2007 WL 2781661 (N.D. Tex. Sept. 25, 2007) ................................. A-5

Ewaldsen v. Atlantic Ins. Brokers, L.L.C.,
599 S.E.2d 223, 225 (Ga. Ct. App. 2004)..................................................................... 20

F & W Agriservices, Inc. v. UAP/Ga. Ag. Chem., Inc.,
549 S.E.2d 746, 749 (Ga. Ct. App. 2001)..................................................................... 16

F.N. Roberts Pest Control, Co., v. McDonald,
208 S.E.2d 13, 16 (Ga. Ct. App. 1974)......................................................................... 22

Federal Ins. Co. v. National Distributing Co., Inc.,
417 S.E.2d 671, 674 - 75 (Ga. Ct. App. 1992)............................................................ A-6

Fottler v. Moseley, 179 Mass. 295 (1901) ................................................................................... 17

General Motors Corp. v. Eighth Jud. Dist. Court of State of Nev.
ex rel. County of Clark, 134 P.3d 111, 116 -117 (Nev. 2006)............................A-4

Georgia Farm Bureau Mut. Ins. Co. v. Williams,
597 S.E.2d 430, 431 (Ga. Ct. App. 2004)....................................................A-2

Gordon v. Buntrock, 2000 WO 556763, *3 (N.D. Ill. Apr. 28, 2000)..........................17

Graves v. Diambrose, 534 S.E.2d 490, 492 (Ga. Ct. App. 2000)................................22

Gutman v. Howard Sav. Bank, 748 F. Supp. 254 (D.N.J. 1990)..................................17

Hendon Properties, LLC v. Cinema Development, LLC
620 S.E.2d 644, 651 (Ga. Ct. App. 2005).....................................................16

Horowitch v. Diamond Aircraft Industries, Inc., 526 F. Supp.2d 1236 (M.D.Fla. 2007) .......... A-5

Howard v. Cent. Of Ga. Railroad Co.,
71 S.E. 1017 (Ga. Ct. App. 1911).............................................................23

Huddle House, Inc. v. Paragon Foods, Inc.,
587 S.E.2d 845, 848 (Ga. Ct. App. 2003).....................................................19

Huong Que, Inc. v. Luu, 58 Cal. Rptr. 3d 527, 535 (Cal. 2007) ...............................19

In re Fortran Printing, Inc., 297 B.R. 89, 96 (Bkrtcy.N.D.Ohio,2003).........................25

In re Frye, 216 B.R. 166, 174 (Bkrtcy.E.D.Va.,1997)..........................................25

In re Lyons Transp. Lines, Inc., 163 B.R. 474, 476 (Bkrtcy. W.D. Pa.,1994) ..................25

In re Matter of Kaleidoscope, Inc., 25 B.R. 729 (D.C. Ga. 1982) .............................20

In re SmartTalk Teleservices, Inc. Securities Litigation,
124 F.Supp.2d 505, 521 (S.D. Ohio 2000) ....................................................A-1

In re Tidewater Group, Inc., 8 B.R. 930, 931 (Bkrtcy.Ga. 1981) ..............................26

In re Worldcom, Inc. Sec. Litig., 336 F. Supp. 2d 310, 318-23 (S.D.N.Y. 2004) ..............16

Inglewood Teachers Ass'n v. Pub. Employment Relations Bd.,
278 Cal. Rptr. 228 (Cal. Ct. App. 1991).....................................................20

International Business Machines Corp. v. Kemp,
536 S.E.2d 303, 306 (Ga. Ct. App. 2000) .....................................................3

Kimmel v. Goland, 793 P.2d 524, 525 (Cal. 1990) ............................................27

Kupiec v. Amer. Int'l Adjustment Co., 235 Cal.App. 3d. 1326, 1331 (1991)...................28

Landscape Properties, Inc. v. Vogel, 46 F.3d 1416, 1425 (8th Cir. 1995) ...................25

Leonard v. Fireman's Ins. Co., 111 S.E.2d 773, 776 (Ga. Ct. App. 1959)....................24

Martin v. Stokes, 623 F.2d 469, 471 (6th Cir. 1980).....................................A-2, A-3

Matter of Cotton, 127 B.R. 287, 290 (Bkrtcy.M.D.Ga.,1991), aff'd,
136 B.R. 888 (M.D.Ga.1992) rev'd. on other grounds, 992 F.2d 311 (11th Cir.1993) ..........25

Metropolitan Atlanta Rapid Transit Authority v. Reid, 640 S.E.2d 300 (Ga. Ct. App. 2006) .....22

Mgmt. Science America v. NCR Corp., 765 F.Supp. 738 (N.D.Ga. 1991)...............................A-3

Nelson v. International Paint Co., 716 F.2d 640, 643 (9th Cir. 1983)........................................A-2

Olszewski v. Scripps Health, 69 P.3d 927, 949 (Cal. 2003)........................................................26

Oswald Mach. & Equip., Inc. v. Yip,
    13 Cal. Rptr. 2d 193 (Cal. Ct. App. 1992) ...........................................................................20

Pabian Outdoor-Aiken, Inc. v. Dockery,
    560 S.E.2d 280, 283 (Ga. Ct. App. 2002) ...........................................................................16

Piper Aircraft Co. v. Reyno, 454 U.S. 235, 244 , 102 S.Ct. 252, 260 (1982)...........................A-1

RCA Corp. v. Tucker, 696 F.Supp. 845 (E.D.N.Y. 1988) ........................................................A-3

Rental Equipment Group, LLC v. MACI, LLC,
    587 S.E.2d 364, 368 (Ga. Ct. App. 2003)............................................................................16

Richelle L. v. Roman Catholic Archbishop,
    130 Cal. Rptr. 2d 601, 609 (Cal. Ct. App. 2003) .............................................................18-19

Risdon Enterprises, Inc. v. Colemill Enterprises, Inc.,
    324 S.E.2d 738, 740 (Ga. Ct. App. 1984) ...........................................................................A-3

Rogers v. Cisco Sys. Inc., 268 F. Supp. 2d 1305 (N.D. Fla. 2003) ...........................................17

Rosen v. Chrysler Corp., 205 F.3d 918, 921 n.2 (6th Cir. 2000)..............................................A-1

S & A Indus., Inc. v. Bank Atlanta, 543 S.E.2d 743, 750 (Ga. Ct. App. 2000) .....................19-20

Seideman v. Sheboygan Loan & Trust Co., 198 Wis. 97 (1929) ...............................................17

Silberg v. Anderson, 786 P.2d 365, 368-69 (Cal. 1990)............................................................28

Small v. Fritz Companies, Inc., 65 P.3d 1255 (Cal. 2003) ........................................................17

Spears v. Mack & Bernstein, P.C., 490 S.E.2d 463, 465 (Ga. Ct. App. 1997).....................23, 24

Spence v. Glock, 227 F.3d 308 (5th Cir. 2000) ........................................................................A-5

Tattersall Club Corp. v. White, 501 S.E.2d 851, 855-56 (Ga. Ct. App. 1998)...........................22

Travelers Ins. Co. v. King, 287 S.E.2d 381, 383 (Ga. Ct. App. 1981) .......................................24

Tyler v. Lincoln, 272 Ga. 119 (2000)........................................................................................22

Whiteley v. Philip Morris Inc., 117 Cal.App.4th 635, 688,
    11 Cal.Rptr.3d 807, 851 (Cal.App. 1 Dist.,2004) ...............................................................16

## STATUTES

California Civil Code § 47 ..........................................................................................................27

O.C.G.A. § 10-7-30...................................................................................................................21

O.C.G.A. § 13-6-11...................................................................................................................21

O.C.G.A. § 23-2-58...................................................................................................................18

O.C.G.A. § 51-12-5.1................................................................................................................23

## I.   **INTRODUCTION**

Royal's motion is premised in the erroneous presumption that California law applies to these claims.  In fact, these claims sound in tort, were originally brought in a Georgia court, and thus Georgia's choice of law rules and consequently, Georgia substantive laws govern this dispute.  When analyzed under the appropriate and applicable substantive law, Royal's motion for summary judgment must be denied.  NetBank has properly alleged and offered evidence supporting the claims at issue in this motion.  Thus, at a minimum, genuine issues of fact remain to be decided by a finder of fact.

NetBank purchased from Commercial Money Center, Inc. ("CMC") a series of payment streams from pooled equipment leases between 1999 and 2000.  These purchases were memorialized in 17 different Sale and Servicing Agreements ("SSAs") in which NetBank, CMC, and various sureties were parties.  In seven of the SSAs, Amwest was the original surety and servicer, with CMC acting as its sub-servicer.  Royal later assumed the responsibilities of Amwest under these seven SSAs in early 2001 including its responsibilities as agent, custodian, bailee, and servicer for NetBank and issued bonds guaranteeing the payment of the lease streams due under the SSAs.  CMC continued to act as sub-servicer for Royal just as it had for Amwest.

When NetBank failed to receive a payment from CMC, as sub-servicer, under the SSAs in December 2001, NetBank promptly made claims under the Royal bonds.  While Royal made one payment under the bonds, and initially confirmed its role as servicer of the leases, Royal subsequently refused to make any further payments, breaching both its obligations under the SSAs and the bonds.  Adding insult to injury, Royal thereafter completely abdicated its responsibilities as servicer and agent by, among other actions, (1) paying the CMC bankruptcy

trustee to abandon an agreement he had reached with NetBank, and (2) financing the continuation of the trustee's avoidance action against NetBank.

While these matters are still the subject of litigation, Royal in this motion asks the Court to sanction its deliberate and tortious violations of its contractual and fiduciary duties to NetBank by granting it summary judgment. It is through this rather appalling strategy that Royal seeks to profit from its own defalcations as surety, agent and servicer to NetBank. Fortunately, however, no legal or equitable basis exists for permitting Royal to do so, and the motion must be denied.

## II.  STATEMENT OF FACTS

Royal first began to participate in the CMC equipment lease program in November 2000 as both a surety and a servicer. Unlike other sureties, however, Royal was also involved in a number of other capacities in the CMC equipment lease program. A Royal joint venture, Custom Risk Solutions ("CRS"), was involved in underwriting CMC on Royal's behalf and in setting up a captive insurance company for CMC in Bermuda that was expected to reinsure the bonds issued by Royal.

### A.  A Summary of the CMC Opportunity to Royal.

The Financial Enhancement Group at Royal's headquarters in Charlotte, NC was approached by Michael Anthony in 2000 about issuing bonds in the CMC equipment lease program and about the possibility of assisting CMC in conducting a securitization of its lease pools. [Van Epps p. 111]. Contemporaneously, CRS was approached about assisting CMC and Anthony & Morgan in setting up a captive insurance company. [Id.; Vitiello pp. 64-68].

The opportunity that is the subject of this litigation, however, was the ongoing issuance of bonds for the CMC equipment lease program, what some Royal witnesses referred to as the "flow business," where Royal would sell bonds and collect a premium. [Vitiello p. 78].

From the earliest point in its involvement with CMC, Royal understood that the bonds were an inducement to investors to purchase the income streams generated by the leases from CMC and that the essential purpose of the surety bonds was to guarantee the fixed payment amounts owed each month, for 60 months, to the investors. [Deluccia pp. 58-66; Exhs. 91, 94 -96; Van Epps pp. 48-50, Exh. 24; Pugliese Depo. p. 135, Exh. 174; Martin p. 93; Deyo pp. 178-81, Exh. 23; Rood pp. 99-100].

**B.      The Underwriting of the CMC Equipment Lease Program.**

Through its due diligence and investigation of the various opportunities to do business with CMC, Royal learned a great deal about CMC. The Financial Enhancement Group of Royal initially began underwriting CMC in at least September 2000. [Schneider pp. 11-12; Rood pp. 60-63, Exhs. 2, 130; RFA 28].

Michael Anthony initially sent Royal a detailed memorandum describing the CMC equipment lease program in September 2000. [Van Epps pp. 48-50, Exh. 24; RFA 35]. The memorandum outlined the following facts, among others, about the CMC equipment lease program:

- That the leases originated by CMC were "B&C" credits and that there would be a number of defaults regardless of the controls and mitigation employed.

- That the leases were sold to investors.

- That surety bonds were an enhancement to assist CMC in selling the income streams from its equipment leases to investors.

- That the surety would serve as Master Servicer and CMC would serve as sub-servicer.

[Id. and pp. 64-65, Exh. 61; Schneider pp. 13-14].

Royal and its joint venture, CRS, were also provided with significant information about the history of the performance of every lease pool that CMC had sold since its inception two

years previously. [Deyo pp. 135-42, Exh. 3; RFA 82].   The statistics that CRS and Royal were

provided about defaults and delinquencies indicated that the default rates were quite high in

some of the lease pools, reaching 25% in some pools and 55% of the leases in other pools. [Id.][1].

Despite these facts, Royal decided to issue bonds after receiving an indemnity from CMC which

Royal's Financial Enhancement Team described as the "ultimate in recourse agreements."

[Pugliese p. 197, Exh. 154].

Additional information regarding the operation of the CMC equipment lease program and

the importance of the surety bonds to the investors was sent to Royal and CRS during the

underwriting period.  [Schneider pp. 13-15, Exh. 146; RFA 37; see also Deyo pp. 147-49, 159-

60, Exh. 23, p. 7900; Duca pp. 36-41, Exhs. 22 and 23; Deluccia pp. 67-69, 102, Exhs. 22 and

23].  Through the underwriting process, Royal learned of the paramount importance of the bonds

to the investors in the CMC lease program, and that NetBank was such an investor.  [Deluccia

pp. 126-28, Exh. 95; Deyo p. 182, Exh. 25, p. 2953].

## C.    Royal Issues Bonds on the Amwest Pools of Leases.

In the Fall of 2000, it came to the attention of NetBank that the A.M. Best ratings of

Amwest, one of its sureties in the CMC equipment lease program, had declined below an "A-."

That was the level that CMC had promised investors like NetBank that the sureties issuing bonds

to guarantee the income streams would possess. [Bowers pp. 155-57].  When NetBank

expressed concern about this situation, CMC and Anthony proposed purchasing new bonds

issued by Royal to replace the Amwest bonds. [Id.].

CMC requested in December 2000 that Royal, already a participant surety in the CMC

program, issue replacement bonds on the Amwest pools.  On December 12, 2000, CMC sent

---

[1]        According to Royal's actuary who evaluated the data, "[t]he data that Charlie [a CRS underwriter] had
given me did not make sense.  One plus one did not equal two."  [Nielsen pp. 58-59].

Royal a letter explaining that the bonds were needed due to the "recent downgrades by AM Best to show good faith to our premiere banking relationships." [Deyo pp. 386-92, Exh. 51]. Royal was also told before issuing surety bonds on these lease pools that the leases were in various states of "delinquency, repleven, litigation, workout, or even default" and that CMC was making "any delinquency payments" on the leases. [Deyo pp. 386-87, Exh. 51]. CMC requested that Royal counter-sign that letter confirming that Royal was aware of the varying degrees of collection of the leases for which these replacement bonds were to be issued, and Royal complied. [Id.; RFA 149; Deyo p. 394, Exh. 52].

Royal thereafter issued bonds for the seven pools of leases that had already been sold to NetBank with bonds previously issued by Amwest. [Deyo pp. 195, 381-83; RFA 147; Anthony pp. 618-20, pp. 1266-73; Bowers pp. 155-57]. The replacement bonds were issued by Royal on January 2, 2001. [Deyo p. 398-99, Exh. 36; RFA 151]. The original bonds were thereafter sent to NetBank in accordance with Section 2.2(a)(iv) of the SSA. [Dowling, dated 7/2/03, pp. 261, 264; and 7/3/03 at pp. 64-65]. Paragraph 5 of the bonds provided that if NetBank failed to receive a payment under the leases from either Royal "as servicer or from any subservicer" a default under the lease would occur. [Deyo Exh. 57]. So that the Royal bond form would be acceptable to investors like NetBank, Royal not only agreed to waive all defenses of fraud but, unlike other sureties, it further provided that the bond constituted "an unconditional and absolute guarantee of payment." [Id.; Van Epps pp. 75-79, Exhs. 63, 65].

Having issued bonds in at least one prior CMC deal in which Royal executed an SSA, Royal understood that by issuing the replacement bonds, NetBank was to be the intended obligee. Thus, each Royal bond guaranteed CMC's obligation as subservicer under the Amwest SSAs to make the required monthly payments to NetBank on the scheduled due date under each

such Amwest SSA.  Each Amwest SSA defined "surety bond" as one issued by Amwest "or its successor" in which NetBank was the obligee.  All right, title, and interest in each such bond was assigned to NetBank as property "hereafter acquired" under the terms of the Amwest SSAs.[2]  A first priority security interest in the bonds was also conveyed to NetBank by operation of the Amwest SSAs.  [See discussion *supra* at pp. 3-4 and SSA generally].

Following the receipt of the replacement bonds from Royal, NetBank called Royal's lead underwriter, Charles Deyo, and asked that he verify information about the bonds that Royal had issued on the pools of leases previously guaranteed by Amwest.  [Deyo pp. 371-72; Camp pp. 161-62].  NetBank also wrote Deyo, as Royal's representative, and requested that Royal verify in writing certain information about the bonds.  [Deyo pp. 404-14, Exhs. 56, 58, 59; RFA 156].  Specifically, NetBank requested that Deyo confirm the following information:

> In connection with an audit of our financial statements, please confirm the following information as of January 02, 2001 related to the attached listing of surety bonds and return the signed confirmation in the accompanying self-addressed envelope.  Please confirm that the attached listing of surety bonds correctly state surety bonds that have been underwritten and validly issued by Royal Indemnity Company to NetBank (Purchaser) on leases sold by Commercial Money Center, Inc. (Seller); *that Royal Indemnity Company is the servicer of each lease (Servicer);* that the surety bonds covering each lease are for the remaining term of each lease; that all of the surety bonds guarantee payment by Royal Indemnity Company to the Purchaser of all scheduled lease payments; and that all of the surety bonds cover all forms of default and fraud by the related lessee, Seller, Servicer and any subservicer.

[Deyo pp. 404-14, Exhs. 56, 58, 59; RFA 157 (emphasis added)].  When Deyo received the letter, he reviewed it, understood it, and signed the letter in the place indicated in his capacity as "Senior Vice President, Underwriting Facility Manager acting on behalf of Royal Indemnity

---

[2]  The definition of "Lease" under the SSA includes not only the actual lease contracts listed on Exhibit A to the SSA, but also "all monies at any time paid or payable thereon or in respect thereof on and after the Cut-Off Date and all rights of the lessor in the related Equipment, Insurance Policies, Surety Bonds and any other security for the payment of amounts due under such contracts."

Company." [Id.; see also Deyo pp. 502-04; RFA 158].  By signing the letter and returning it to NetBank, Deyo agreed that he was confirming the facts recited in the letter.  [Deyo pp. 407].

Royal continued to issue bonds in the CMC equipment lease program following its agreement to issue bonds to NetBank.  By mid-2001, Royal had placed nearly 1000 lease bonds in that program with a financial commitment in security of nearly $88 million.  [Chandler pp. 179-83, Exh. 197].  Thus, Royal played a major role in the CMC equipment lease program.

**D.     The Importance of the Bonds to NetBank.**

The key reason that NetBank agreed to invest in the CMC lease program was the fact that CMC's monthly payment obligations to NetBank under the SSAs were guaranteed by a surety company with an "A-" or better rating according to A.M. Best.  [Watson pp. 40, 97-99; Grimes pp. 149-51].  When the ratings of Amwest began to decline significantly under that level, NetBank sought additional security for its investment.  [Bowers pp. 155-57].  Royal, which had already joined the group of sureties offering bonds to the CMC program, stepped in and agreed to provide that security.  [Deyo pp. 270, 370-71, 394].  NetBank relied heavily on Royal's issuance of the replacement bonds and assumption of Amwest's obligations under the Amwest SSAs.  If Royal had not taken these steps, NetBank would either have asked CMC for a replacement surety that would have honored these obligations, or NetBank would have sold its Amwest-backed lease pools in the secondary market for such investments. [See Affidavit of Bowers].

**E.     Royal Assumed the Responsibility of Servicing the Leases Under the SSAs When it Issued the Bonds.**

The existence and function of the SSAs was disclosed to both Royal and CRS by A&M. [Deluccia pp. 101-02, Exhs. 22 and 23, pp. 115-17, 129, Exh. 95; Van Epps pp. 48-49, Exh. 24, and pp. 64-65, Exh. 61; Chandler, pp. 92-98; RFAs 64, 65].  A sample SSA was included in what

has been described by Royal as the "original submission" by CMC to Royal regarding the equipment lease program. [Martin pp. 274-79, Exh. 217].

Based on its discussions with CMC and A&M and its own underwriting, Royal understood very early in the process that the surety companies issuing bonds in the CMC equipment lease program were to act as the primary or "Master" servicer of the leases with sub-servicing done by CMC. [Deluccia pp. 68-70, Exh. 23; Van Epps pp. 48-49, Exh. 24, and pp. 64-65, Exh. 61, and pp. 66-67, Exh. 62]. Royal was further told that "A&M will need power of attorney so they can sign as insurance company to be master servicer." [Deluccia pp. 115-17, 127, Exh. 95]. If those disclosures were not sufficiently clear, the Royal bonds themselves referred to Royal as the "master servicer." [See, e.g., Chandler pp. 94-98, Exh. 178].

Not only were there specific disclosures to Royal of the duties of the surety as servicer in the CMC equipment lease program, Royal knew that it was serving in that capacity. Gil Chandler, an in-house lawyer for Royal, speaking as a 30(b)(6) witness, admitted that he would expect the surety to have control over the servicing. [Chandler, p. 96]. Moreover, Chandler admitted that "Royal knew that it had control over the servicing" of the leases in the CMC lease pools. [Chandler pp. 98; 175]. Further, Royal's lead underwriter, Charles Deyo, confirmed in writing to NetBank that Royal was the "servicer" of the leases in the NetBank lease pools. [Deyo pp. 404-05, Exhs 56, 58; Chandler p. 206-07; see discussion supra at pp. 5-6].

In early 2002, following the first claims filed by investors like NetBank, Royal also began taking further overt steps in its role as servicer. [Chandler pp. 97-98]. In early 2002, NetBank representatives met with Royal representatives in Philadelphia to discuss the NetBank claim. [Schneider p. 199; RFA 124]. Following this meeting, Royal agreed to pay NetBank, under a reservation of rights, provided that NetBank confirm in writing that Royal "had been and

hereby is appointed as the successor servicer under each of the [Amwest Sales and Servicing] Agreements." [Bowers pp. 279-82; RFA 126]. William Hibberd, the lead underwriter for Royal's Financial Enhancement Unit, signed this document on behalf of Royal, and Robert Bowers, NetBank's CFO, signed the document on behalf of NetBank. [Hibberd pp. 85-86, Exhs. 69, 70; Chandler pp. 172-76; Exhs. 70, 196; RFA 128].

Royal exercised its rights as successor to Amwest under the Amwest SSAs by first sending a letter terminating CMC as subservicer. [Hibberd pp. 87-88, Exh. 71; RFA 129; Chandler p. 177]. When CMC did not turn over the documents necessary for Royal to move forward in its capacity as servicer, Royal filed suit against CMC, alleging that Royal had assumed the role of servicer on the Amwest pools when the replacement bonds were issued. [Chandler p. 179]. The Complaint that Royal filed against CMC alleges, without qualification or reservation of rights, that:

> CMC and Royal entered into several Sale and Service Agreements. On some Sale and Service Agreements, Amwest was the surety and Servicer. Amwest was later replaced and Royal assumed the roles of surety and Servicer on all leases relevant to the instant Complaint.

[Chandler pp. 179-83, Exh. 197]. Significantly, the SSA attached to the Royal complaint was one of the SSAs that Amwest executed and whose duties Royal had admittedly assumed. Royal supported these allegations with an affidavit of Bill Hibberd, the leader of its Financial Enhancement Group. [Chandler pp. 187-88, Exh. 200]. In addition, Royal's attorney of record, J. Christopher Jaczko of Cooley Godward, LLP, filed a similar declaration affirming that Royal was the servicer of these leases. [Chandler pp. 187-88, Exh. 201]. Based upon these allegations, Royal won the right to replace CMC as subservicer and obtain from CMC the lease files necessary to carry out those duties. Royal also sought and obtained several temporary

restraining orders against CMC on the basis of these allegations. [Chandler pp. 182-84, 188-89, Exhs. 198, 199, 202, 203, 204].

Over the course of its participation in the CMC equipment lease program, Royal repeatedly assured NetBank on a number of different occasions that it had, in fact, assumed the role of servicer under the Amwest SSAs:

- By indicating in the surety bonds themselves that Royal was the servicer.

- Though a confirmation letter in January of 2001 executed by Charles Deyo that Royal was the servicer of the Amwest lease pools.

- Through a request by Bill Hibberd of Royal in January of 2002 that NetBank confirm Royal had replaced Amwest as servicer under the Amwest SSAs.

- By Royal filing a lawsuit in February of 2002, as servicer, seeking to remove CMC as subservicer.

- By taking over the servicing operations from CMC and carrying out the duties of the servicer and subservicer.

[See Bowers Affidavit generally and at ¶ 27]. NetBank relied on these assurances, and it was not until May of 2002 that Royal, for the first time, suggested that it was not acting as servicer under the Amwest SSAs. [NB 72115-7; NB 72112-4; NB 71551-3].

F.    Royal's Duties as Servicer are set out in the SSAs.

The duties of Royal, as servicer, were comprehensive. Royal agreed to act as "agent," "custodian," and "bailee" for NetBank. [SSA 3.1]. The SSAs provided that Royal, "in such capacity, shall manage, service, administer and make collections on the Leases, and perform the other actions required of the Servicer under" the SSA. [SSA 3.1(a); also see 2.2(a)]. The Servicer was given the right and obligation under the SSAs to bill, collect, and post payments, enforce all material rights and responsibilities of the lessor, forego collection efforts, execute instruments of satisfaction, administer the surety bonds and make claims thereunder, commence litigation to enforce leases, modify or amend a lease, grant payment extensions, allow

prepayments, sell collateral, pay insurance and taxes, sue to collect on insurance policies, and file financing statements, to name but a few such rights and obligations. [See SSA, sections 3.2 through 3.12].

Perhaps the most important duty of a servicer such as Royal, however, was the servicer's overarching duty to protect the interest of NetBank and other investors in the leases and bonds pursuant to the SSA. The servicer agreed under the SSA not to assert any beneficial ownership interests in the leases or the lease files. [SSA 2.2(d)]. The Servicer promised "as agent for the Purchaser" to "defend the [lease payments and bonds] against any and all claims and demands of all Persons at any time claiming the same or any interest therein adverse to that of the Purchaser." [SSA 2.3]. The servicer promised to "do nothing, by act or omission, to impair the rights of the Purchaser or the Seller in the leases, the Insurance Policies or the other Lease Assets or Surety Bonds …." [SSA 3.6(b)(ii)].

The parties represented that the SSA was to be a true sale, but they recognized that there was a risk that the transaction might be characterized as a loan, in which event CMC conveyed to NetBank a first priority security interest in the lease payments and the surety bonds. [SSA 2.1(c)]. In light of the potential for such an occurrence, the servicer was required to "take all actions necessary to obtain and maintain, in favor of the Purchaser, a first Lien on and a first priority, perfected security interest in the [lease payments and bonds]." [SSA 3.13]. Finally, the servicer was required to "take such other action necessary or advisable to … preserve and defend title to the [lease payments and bonds] and the rights of the Purchaser in such [lease payments and bonds] against the claims of all persons and parties." [SSA 3.13(b) and (e); Chandler pp. 282-84].

**G.      The Cessation of Royal's Participation in the CMC Program.**

Royal learned certain facts about CMC and its principals in the winter and spring of 2001 that ultimately led it to cease doing business with CMC.  First, an anonymous letter arrived at Royal that reported on the CMC equipment lease program.  [Van Epps pp. 90-93; Hibberd pp. 64-65, Exh. 67; Schneider pp. 38-40; RFA 166; Chandler p. 106; Horvath pp. 22-45, Exhs. 44, 219, 222].  The anonymous letter accused CMC of, among other things, being a "loan shark" and alleged that CMC and A&M were operating a "ponzi scheme."  [Id.].

Royal quickly commenced an investigation of the allegations contained in the letter.  [Schneider pp. 175-90, Exhs. 156, 157].  Royal initially hired IRG, a Royal subsidiary that does insurance investigations, to look into the anonymous letter and perform a background check on CMC, A&M and their principals.  [Schneider pp. 38-40, Exh. 67; RFA 170].  Royal asked IRG to "verify" the information in the anonymous letter.  IRG sent Royal two written reports and made a verbal report on its findings.  [Schneider pp. 179, 186, Exhs. 156-57; Chandler pp. 118-59].  The reports confirmed the accuracy of the information received in the anonymous letter.  IRG reported that "[i]nquiries conducted in order to confirm reported questions [sic] background of Commercial Money Center and Smith Morgan Company, found that information provided to Royal SunAlliance was valid.  There is evidence of poor business practices, as well a [sic] questionable financial underwriting."  [Moore p. 36, Exh. 156; RFAs 171, 172, 173, 174].  IRG's representative testified "this did not look like a good business."  [Moore p. 27].

IRG also performed a subsequent investigation of Sterling Pirtle.  [Moore pp. 44-46; Exh. 157].  In a second report, IRG concluded that Pirtle "had a questionable business background and a high potential of negative returns on any business decisions."  [Id.].  No one at

Royal ever challenged IRG's conclusions or asked it to conduct any further investigation. [Moore pp. 29, 44].

Finally, it was discovered during the establishment of the captive insurance company for CMC in Bermuda that Ronald Fisher had been the subject of a prior SEC cease and desist order from an earlier failed business. [Deyo pp. 326-27]. Price Waterhouse discovered the cease and desist order while determining whether it would represent the captive and its owners. [Deluccia pp. 144-46].

Royal thereafter stopped issuing bonds in the CMC equipment lease program and terminated Anthony's power of attorney. [Hibberd pp. 65-66].

What Royal did not do was inform NetBank of its conclusions regarding the CMC equipment lease program. Contrary to its obligations as NetBank's agent and contrary to its contractual obligations under the SSAs, [See SSA 3.10], Royal simply chose to keep quiet. Thus, NetBank had no reason to know that its investment was in peril. NetBank never came to learn of Royal's concerns until May of 2002 when Royal informed NetBank for the first time that it would not honor NetBank's claims. [NB 72115-7; NB 72112-4; NB 71551-3].

## H.    NetBank Files Its Claim Against Royal.

NetBank served its first claim against Royal, as servicer and surety, on December 28, 2001. [Chandler p. 122, Exh. 195]. Royal initially paid this first claim under a reservation of rights, but it then stopped paying any further claims and notified NetBank that it would not do so in the future. [Chandler pp. 172-74, Exh. 196]. Royal claimed as a defense to payment that CMC was a ponzi scheme, the precise allegation made over a year earlier in anonymous letters to Royal which were confirmed in many respects by Royal's own in-house investigators. [Chandler pp. 297-303].

I.    **Royal Abdicates its Duties as Agent and Servicer.**

Royal elected to abdicate its responsibilities as servicer in May 2002.  Having obtained

the right to appoint its own subservicer, and having appointed U.S. Bancorp to take over those

responsibilities, Royal announced in May 2002 that it was disclaiming any further responsibility

to NetBank under the Amwest SSAs.  [NB 72115-7; NB 72112-4; NB 71551-3].  Thereafter,

Royal (1) paid the CMC bankruptcy trustee to abandon his settlement agreement with NetBank

and (2) financed the continuation of the trustee's avoidance action against NetBank on the

grounds that the transactions were disguised loans where NetBank's security interest in the

leases and bonds had never been perfected.  These acts are a direct breach of the duties that

Royal undertook to protect NetBank, including, among others, sections 2.3, 3.6(b)(ii), and

3.13(b) and (e) of the Amwest SSAs.

### III.    ARGUMENT AND CITATION TO AUTHORITY

A.    **Georgia Law Applies to NetBank's Claims.**

Although this Court earlier determined that California law applies to some of the

investors' claims, the choice of law rules applicable to NetBank's tort claims here all require the

application of Georgia law.  NetBank's choice of law analysis is attached hereto at Appendix A.

B.    **The Record Demonstrates that NetBank Justifiably Relied on Royal's Misrepresentations.**

Royal argues that no evidence exists that NetBank justifiably relied on Royal's

misrepresentations, and accordingly, that summary judgment should be entered on NetBank's

claims for Fraud or Negligent Misrepresentation (Count IV) and Promissory Estoppel (Count

VIII).  Royal's argument fails because there is evidence that NetBank did rely on Royal's

representations and that its reliance was justifiable.  Thus, issues of fact exist precluding

summary judgment.

NetBank's Third Amended Complaint specifically states that NetBank relied upon the representations of the sureties, including Royal, not only in making the decision to purchase an interest in the lease pools, but also in *retaining an interest in the Lease pools*. [See NetBank's Third Amended Complaint at ¶¶ 22, 25, 127, 130, and 148]. The representations made by the sureties, including Royal, regarding the underwriting of, and assumption of the risk associated with, the lease pools and CMC, the maintenance of safeguards and reserves with respect to the lease pools, the duties that each would perform as servicer, the enforceability of the performance bonds, the waiver of defenses under the performance bonds and SSAs, their willingness and ability to stand by the promises they made in the SSAs and the performance bonds, were material to NetBank's decision to purchase *and to retain* the lease pools. [Id. at ¶ 127]. "Had these representations not been made, NetBank would not have purchased *or retained* the lease pools." [Id. at ¶ 24].

Royal makes the erroneous argument that there is "no record evidence that NetBank *ever considered* selling its interest in the CMC lease pools," and thus that NetBank could not have relied upon Royal's misrepresentations. [See Royal's 1st MSJ at p.15]. To the contrary, there is evidence in the record that NetBank did consider selling its lease pools. [Bowers p. 258]. Indeed, other investors had successfully sold their lease pools and there was no reason that NetBank could not do so as well. [Pirtle, Vol. 12, 11/17/04, p. 149, Michael Anthony Vol. 6, 11/17/03, p. 1127; GE 1795 - 1820].

Simply because Royal did not bother to adequately question NetBank in depositions about its reliance does not mean that NetBank did not rely on Royal's misrepresentations in retaining the lease pools bonded by Royal bonds. Had Royal not made the representations it did and issued the replacement bonds, NetBank would have pursued a variety of alternatives to

protect its interests in the bonds and leases, including seeking another company to act as surety and servicer in place of Amwest, or selling its interest as other banks in this litigation have chosen to do. NetBank's reliance on Royal's representations is spelled out in greater detail in the affidavit of Robert Bowers, NetBank's former CFO, filed with this response, specifically in paragraphs 19-21.

Moreover, to the extent Royal attempts to argue in a reply that NetBank's reliance upon Royal's representations was not *justified or reasonable*, that is a question of fact that must be determined by a jury. In circumstances such as those that exist in the present action, whether a party 'reasonably relied' on a promise is a question for the jury.[3]

Royal also makes the erroneous argument that because courts' hostility to 'holder actions' is well known, and NetBank's claims are similar to 'holder actions,' Royal is entitled to summary judgment on NetBank's claims for fraud and promissory estoppel. As Royal notes, with 'holder actions' an investor claims that it held its interest in a security – as opposed to purchasing or selling – based on false or misleading information. The case Royal cites for this proposition, however, In re Worldcom, Inc. Sec. Litig., 336 F. Supp. 2d 310, 318-23 (S.D.N.Y. 2004), dealt with the difficulties in bringing holder *class action* claims, mainly due to the difficulty in proving reliance in a class context. See Id. at 320-21. Not only is the class action situation inapplicable to the case at bar, but it is simply not correct that there is a general hostility

---

[3] See, e.g., F & W Agriservices, Inc. v. UAP/Ga. Agric. Chem., Inc., 549 S.E.2d 746, 749 (Ga. Ct. App. 2001), (the Georgia Court of Appeals held that evidence presented by the party claiming promissory estoppel that they took certain actions after receiving an alleged promise was sufficient to create a question of fact on whether the party 'reasonably relied.'); Pabian Outdoor-Aiken, Inc. v. Dockery, 560 S.E.2d 280, 283 (Ga. Ct. App. 2002); Hendon Prop., LLC v. Cinema Dev., LLC, 620 S.E.2d 644, 651 (Ga. Ct. App. 2005) ("Reasonable reliance thus presents a question of fact."); Ades v. Werther, 567 S.E.2d 340, 344 (Ga. Ct. App. 2002) ("As fraud is inherently subtle, a claimant may survive summary judgment if there is slight, circumstantial evidence supporting a fraud claim. 'It is peculiarly the province of the jury to pass on these circumstances showing fraud.'"); Rental Equip. Group, LLC v. MACI, LLC, 587 S.E.2d 364, 368 (Ga. Ct. App. 2003) (noting with regard to a promissory estoppel claim, "the issue of the reasonableness of reliance was peculiarly a jury question."). California law is in agreement that whether reliance was justified is a question of fact. Whiteley v. Philip Morris Inc., 11 Cal.Rptr.3d 807, 851 (Cal. Ct. App. 2004) (justifiable reliance is a jury question); Alliance Mortgage Co. v. Rothwell, 900 P.2d 601, 609 (Cal. 1995) (same).

among courts toward these types of actions.  To the contrary, many states recognize the validity

of holders' actions.  See e.g., Gordon v. Buntrock, 2000 WL 556763, *3 (n.D. Ill. Apr. 28, 2000)

(recognizing holder actions – in direct conflict with Royal's parenthetical list of states that reject

such claims), Fottler v. Moseley, 60 N.E. 788 (Mass. 1901), Gutman v. Howard Sav. Bank, 748

F. Supp. 254 (D.N.J. 1990) (analyzing the law of New York and New Jersey), Seideman v.

Sheboygan Loan & Trust Co., 223 N.W. 430 (Wis. 1929), Rogers v. Cisco Sys. Inc., 268 F.

Supp. 2d 1305 (N.D. Fla. 2003), Small v. Fritz Cos., Inc., 65 P.3d 1255 (Cal. 2003).

**C.**     **Royal's Attempt to Limit NetBank's Damages Should be Rejected.**

Moreover, Royal's argument that NetBank's damages should be limited *because* of

Royal's tortious conduct fails.  Royal argues that NetBank's relief should be limited to the actual

collections on the lease pools – ignoring the existence of the bonds issued to protect NetBank's

investment.  Essentially, Royal argues that *because* Royal failed to fulfill its fiduciary duties,

failed to fulfill its duty as agent and servicer to perfect NetBank's interest in the lease pools,

challenged NetBank's title to the bonds, and tortiously interfered with NetBank's agreement with

the Trustee, NetBank's damages should be reduced dramatically.   Such an argument is without

merit and must be rejected.

**D.**     **NetBank's Claim for Breach of Fiduciary Duty (Count VI).**

NetBank has alleged that Royal owed a fiduciary duty to NetBank as surety under the

performance bonds, as servicer, and under the SSAs.  For example, under the SSAs, Royal, as

servicer, was expressly authorized and directed to act for NetBank as "agent, custodian and

bailee . . . and in such capacity shall manage, service, administer and make collections on the

Leases, and perform the other actions required of the Servicer under this Agreement." [See SSA

at 3.1].  Royal argues that NetBank's breach of fiduciary duty claim fails because, under

California law, and specifically, Cates Constr., Inc. v. Talbot Partners, 980 P.2d 407, 424-425 (Cal. 1999), a surety is not a fiduciary and owes no fiduciary duty to an obligee. Royal's argument fails for several reasons. First, as explained in Appendix A, California law and Cates do not apply to NetBank's claim for breach of fiduciary duty.

Above and beyond the surety-obligee relationship between Royal and NetBank, however, there exists an agent-principal relationship created by the parties' relationship and the SSA, pursuant to which Royal owes a fiduciary duty to NetBank. [See e.g., SSA 3.1]. The agency relationship imposes a fiduciary duty upon Royal under either Georgia or California law.[4] Under Georgia law, the fiduciary duty owed by an agent is set forth as follows:

> As a fiduciary the agent is required to act primarily for the benefit of the principal in matters connected with the agency. Among the agent's fiduciary duties is to act with proper skill and diligence, and not to make a personal profit from the agency. Moreover, the agent is subject to the duty of loyalty to his principal and must deal fairly with him at all times. The principal has the right to expect from his agent a full revelation of all pertinent facts which might jeopardize ... rights in the property entrusted to the . . . agent.

AT & T Corp. v. Prop. Tax Services, Inc., 655 S.E.2d 295, 300 (Ga. Ct. App. 2007). See also O.C.G.A. § 23-2-58 ("[A] relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.").

California law is no different – recognizing that an agent owes a fiduciary duty to its principal. See Richelle L. v. Roman Catholic Archbishop, 130 Cal. Rptr. 2d 601, 609 (Cal. Ct.

---

[4]    RESTATEMENT (SECOND) CONFLICT OF LAWS § 159 ("(1) The law selected by application of the rule of § 145 determines whether the actor owed a duty to the injured person and whether this duty was violated. (2) The applicable law will usually be the local law of the state where the injury occurred.").

App. 2003) (noting that a "fiduciary relationship is a recognized legal relationship such as . . . principal and agent. . . ."); Huong Que, Inc. v. Luu, 58 Cal. Rptr. 3d 527, 535 (Cal. Ct. App. 2007) (finding that agency is a fiduciary relationship where the agent assumes "a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship") (quoting RESTATEMENT (THIRD) OF AGENCY § 8.01); Eddy v. Sharp, 245 Cal. Rptr. 211, 214 (Cal. Ct. App. 1988) (holding that insurance agent owed a duty of care to insureds because, "[w]here the agency relationship exists there is not only a fiduciary duty but an obligation to use due care").[5]

### 1.   Factual Issues  Regarding the Creation of an Agency Relationship Would Preclude Summary Judgment.

To the extent this Court decides that whether Royal was NetBank's agent is a factual issue[6], such factual issues would preclude the entry of summary judgment on NetBank's claims for breach of fiduciary duty.

Under Georgia law, whether an agency relationship or fiduciary duty exists (in situations where the agency does not rest on a written document) is a question of fact for the jury. See e.g., Bloodworth v. Bloodworth, 579 S.E.2d 858, 862 (Ga. Ct. App. 2003) (finding that a jury must resolve the central question of whether defendants breached their fiduciary duties); Bienert v. Dickerson, 624 S.E.2d 245, 248-49 (Ga. Ct. App. 2005) ("[T]he existence of a confidential or fiduciary relationship is generally a factual matter for the jury to resolve."); S & A Indus., Inc. v. Bank Atlanta, 543 S.E.2d 743, 750 (Ga. Ct. App. 2000) (finding that questions regarding the

---

[5]      Moreover, an agency relationship was not at issue in Cates Constr., Inc. v. Talbot Partners, 980 P.2d 407, 424-25 (Cal. 1999).

[6]      Note, however, that the SSA, *a written document*, specifically recognizes and authorizes the agency relationship between the parties.  In situations such as this, where the question of the agency rests upon a written document, as in the instant case, the issue of whether an agency relationship exists is a *question of law*.  Huddle House, Inc. v. Paragon Foods, Inc., 587 S.E.2d 845, 848 (Ga. Ct. App. 2003) ("Where the question of agency rests upon a written document and inferences deduced therefrom . . . the issue presented is a question of law.").

extent and existence of an agent's authority are questions for the triers of fact.); Am. Global Dev. Group, Inc. v. Sasser & Weatherford, Inc., 548 S.E.2d 465, 468 (Ga. Ct. App. 2001) (holding that if parties dispute the extent of an agent's authority, the jury must decide the issue).[7]

Accordingly, Royal's Motion for Summary Judgment should be denied as to NetBank's claim for breach of fiduciary duty because issues of fact exist as to the scope and existence of Royal's agency.

### 2. Royal's Effort to Strip NetBank of Its Rights to the Royal Bonds in the CMC Bankruptcy is, In and Of Itself, A Breach of Fiduciary Duty.

As Royal notes in its Motion for Summary Judgment, Royal proposed competing offers to the bankruptcy trustee in the CMC Bankruptcy, ultimately entering into a proposed "Royal-Trustee" Agreement, under which Royal would actually fund the Trustee's pursuit of avoidance claims against NetBank. As NetBank's agent, this action of Royal, in and of itself, is a breach of the fiduciary duty Royal owed to NetBank. Under Georgia law, as NetBank's agent, Royal was not only prohibited by the SSAs, but prohibited by statute, from disputing and interfering with NetBank's ownership of the leases and bonds.

> An agent may not dispute his principal's title, except in such cases where legal proceedings, at the instance of others, shall have been commenced against him.

O.C.G.A. § 10-6-26. See Ewaldsen v. Atlantic Ins. Brokers, L.L.C., 599 S.E.2d 223, 225 (Ga. Ct. App. 2004) (quoting O.C.G.A. § 10-6-26); In re Matter of Kaleidoscope, Inc. 15 B.R. 232, 239 (Bkrtcy. Ga., 1981) (quoting O.C.G.A. § 10-6-26), *reversed on other grounds*, In re Matter of Kaleidoscope, Inc., 25 B.R. 729 (Bankr. N.D. Ga. 1982). Moreover, these actions breached

---

[7]    Similarly, contrary to Royal's arguments, even under California law the existence and scope of an agency relationship is also a question of fact for the jury. See, e.g., Cal. Viking Sprinkler Co. v. Pac. Indem. Co., 29 Cal. Rptr. 194 (Cal. Ct. 1963) ("The existence of an agency relationship and the extent of the authority of the agent are questions of fact for the jury."); Inglewood Teachers Ass'n v. Pub. Employment Relations Bd., 278 Cal. Rptr. 228 (Cal. Ct. App. 1991) ("Generally, the existence of an agency relationship and the extent of the authority of an agent are questions of fact."); Oswald Mach. & Equip., Inc. v. Yip, 13 Cal. Rptr. 2d 193 (Cal. Ct. App. 1992) ("Unless the evidence is undisputed, the scope of an agency relationship is a question of fact.").

Royal's specific duty to defend NetBank's title to the leases and bonds as set forth in the SSA. [See SSA, sections 3.2 through 3.12].

### E.  Royal's "Bad Faith" in its Role as a Surety and as a Servicer/Agent.

Royal argues that NetBank's bad faith claim should be dismissed because *under California law*, there is no tort liability for a bad faith claim for failure to pay upon surety bonds. As stated earlier, California law does not apply to this claim.[8]

Under Georgia law, however, NetBank's claims for bad faith – based upon Royal's role as a surety as well as Royal's obligations as a servicer and agent are alive and well. NetBank has alleged that Royal is liable for its bad faith based upon its failure to make payments to NetBank under the bonds, as well as Royal's failure to meet its obligations as a servicer and agent under the SSAs. See Third Amended Complaint at ¶¶ 152-153.

Georgia statute specifically allows for a claim of bad faith in the event a surety refuses to make a payment to an obligee under a suretyship contract. See O.C.G.A. § 10-7-30. In such an event, the surety is liable to pay the obligee for the loss, and also up to 25% of the liability of the surety for the loss and all reasonable attorney's fees for the prosecution of the case against the surety. Id.

Additionally, Georgia law specifically allows for a claim of bad faith in a situation where a defendant has acted in bad faith in performing its duties as something other than a surety or insurer. O.C.G.A. § 13-6-11 provides:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefore and

---

[8]     Moreover, the California Cates case relied upon by Royal, does not preclude NetBank's claims. First, the court in Cates specifically restricted its "*analysis in this case to the subject of construction performance bond.*" Cates, 980 P.2d at 418, n.10. Second, the policy reasons relied upon by the Cates court to preclude the plaintiff's claims in that case, lean towards allowing NetBank's claims here. For further analysis on this issue, NetBank incorporates herein its arguments regarding the Cates case set forth in its response to Safeco's Motion for Summary Judgment.

where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

Under Georgia law, every intentional tort supports a claim for bad faith attorney fees. See Tyler v. Lincoln, 272 Ga. 119 (2000); F.N. Roberts Pest Control, Co., v. McDonald, 208 S.E.2d 13, 16 (Ga. Ct. App. 1974). Bad faith is established where fraud is shown, but also includes dishonesty in a business transaction not rising to the level of fraud. Artzner v. A&A Exterminators, 531 S.E.2d 200, 206 (Ga. Ct. App. 2000); Tattersall Club Corp. v. White, 501 S.E.2d 851, 855-56 (Ga. Ct. App. 1998) (affirming attorney fees award). See also Graves v. Diambrose, 534 S.E.2d 490, 492 (Ga. Ct. App. 2000) ("Bad faith warranting an award of attorney fees must have arisen out of the transaction on which the cause of action is predicated. It may be found in defendant's carrying out the provisions of the contract, that is, in how defendant acted in his dealing with the plaintiff."). NetBank has sufficiently alleged, and indeed proven, that in performing its duties as a servicer and agent, Royal acted intentionally, maliciously, dishonestly and even fraudulently.[9] Accordingly, Royal is not entitled to summary judgment on NetBank's claim against Royal for its bad faith in executing its duties as a surety, and its bad faith in executing its duties as a servicer and agent of NetBank.

## F.  Royal's Breach of Implied Covenant of Good Faith and Fair Dealing.

Again, Royal relies almost exclusively on California law and the Cates decision in concluding that NetBank has failed to set forth a claim for breach of the implied covenant of good faith and fair dealing arguing, that under California law, the claim of breach of the covenant of good faith and fair dealing is not a tort action, and thus, that NetBank's claim is duplicative of its contract claims. To the contrary, NetBank's claim for breach of the implied

---

[9]     In addition to actual fraud, Royal is also liable for constructive fraud. See e.g., Metropolitan Atlanta Rapid Transit Authority v. Reid, 640 S.E.2d 300 (Ga. Ct. App. 2006); Dealertrack, Inc. v. Huber, 460 F. Supp.2d 1177, 1183 (C.D. Cal. 2006).

covenant of good faith and fair dealing is governed by Georgia law, and under Georgia law, NetBank's claim for breach of the covenant of good faith and fair dealing is a *tort*.[10]  In addition to the contractual duties set forth in Royal's bonds and the SSAs, this claim is also based upon duties *independent from Royal's contractual duties* that were imposed upon Royal by statute and common law, including but not limited to, the duty imposed by the law of agency.

Under Georgia law, it is well-established that a plaintiff can bring a separate *tort* claim, like a tort claim for the breach of the covenant of good faith and fair dealing, if the duty imposed upon the defendant arises from somewhere other than the contract itself.  The Georgia Court of Appeals set forth this well-recognized doctrine in Howard v. Cent. of Ga. Ry. Co., 71 S.E. 1017 (Ga. Ct. App. 1911), noting that "if the result of a contract is to create a relationship between the parties, and there are certain duties which the law attaches to that relationship, the breach of one of these duties may give rise to an action in tort."  In Spears v. Mack & Bernstein, P.C., 490 S.E.2d 463, 465 (Ga. Ct. App. 1997), the Georgia Court of Appeals recognized a breach of fiduciary duty claim based upon a partnership agreement.  The Spears court specifically addressed the tort of the breach good faith and fair dealing, noting that:

> While it is true that in this State, a tort action cannot be based on the breach of a contractual duty only, it can be based on conduct which, in addition to breaching a duty imposed by contract, also breaches a duty imposed by law.

Id.  In the Spears case, an attorney who was terminated filed suit against her former employer and two of its shareholders, alleging she was entitled to breach of contract damages and damages in tort, including punitive damages because the defendants had also violated a duty of good faith

---

[10]    Accordingly, under Georgia law, punitive damages can be awarded for such a tort if a proper showing is made: O.C.G.A. § 51-12-5.1 ("Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.").

and fair dealing they owed her due to their fiduciary relationship.  227 Ga.App. at 743, 490

S.E.2d at 464.  The Court of Appeals held that because a fiduciary relationship requires that

parties treat each other fairly and in good faith, the plaintiff was entitled to damages for a *tort*

*claim* of breach of the covenant of good faith and fair dealing, and was entitled to submit a claim

for punitive damages to a jury.  Id.  See also Travelers Ins. Co. v. King, 287 S.E.2d 381, 383 (Ga.

Ct. App. 1981) (holding that the insurance company defendant's tortious interference with

property rights, and potential conversion, was an independent injury over and above a mere

breach of duty arising from an insurance contract, and thus, the plaintiff could assert a *tort* claim

and was authorized to recover punitive damages).[11]

Accordingly, Royal is not entitled to summary judgment on NetBank's claim for breach

of the covenant of good faith and fair dealing.

**G.      NetBank's Claim for Tortious Interference with Contract (Count XII).**

**1.      The NetBank/Lakeland–Trustee Agreement Was a Binding Contract.**

Contrary to Royal's arguments, the NetBank/Lakeland-Trustee Agreement was a valid

and enforceable contract even before the bankruptcy court approved the contract.  Prior to

Royal's tortious interference with the NetBank/Lakeland–Trustee Agreement, the deal was

---

[11]      Georgia courts also have recognized the existence of a similar duty between and insurer and an insured, the breach of which gives rise to a *tort* action.  See e.g., Delancy v. St. Paul Fire & Marine Ins. Co., 947 F.2d 1536, 1545-47 (11th Cir. 1991) (and cases cited therein).  The Court explained:

> The contractual relationship between insurer and insured creates such an independent duty, implied from the terms of the contract, between insurer and insured:  the insurer owes to the insured a duty independent of the contract not to injure him, and when, from its negligent failure or refusal to adjust a claims, or from fraud or other bad faith, he sustains damages other than damages covered by the insurance contract, then an action in *tort* would be appropriate.

Id. at 1545-46 (emphasis in original), quoting Leonard v. Fireman's Ins. Co., 111 S.E.2d 773, 776 (Ga. Ct. App. 1959)(emphasis added)(additional citations omitted).  See also Arrow Exterminators, Inc. v. Zurich American Ins. Co., 136 F.Supp. 2d 1340 (N.D. Ga. 2001) ("An exception exists, however, where there is a special relationship between the parties that creates an independent duty.").

-24-

signed by the parties and the trustee had moved to have the deal approved by the bankruptcy court. This was not a mere proposal or offer that had been made.

While the Bankruptcy Court in the Northern District of Ohio has specifically noted there is a split in authority as to whether such settlement agreements are enforceable absent court approval in the bankruptcy context, under the laws of many states, including Georgia, such settlements are indeed enforceable prior to bankruptcy court approval. See e.g., In re Fortran Printing, Inc., 297 B.R. 89, 96 (Bankr. N.D. Ohio 2003) (noting that the parties' assent to the agreement was not contingent on court approval and that all interested parties were represented at negotiations and as signatories to the agreement).

Many courts have determined that the absence of court approval of a settlement in bankruptcy does not mean there was not an agreement to settle. It only means the court has not approved the agreement. In those courts, an agreement made by parties in bankruptcy to compromise litigation is binding upon all parties to the agreement, pending bankruptcy court determination about whether or not to approve the agreement. See Landscape Properties, Inc. v. Vogel, 46 F.3d 1416, 1425 (8th Cir. 1995) (rejecting a proposed jury instruction that "erroneously stated that an agreement between the trustee and a purchaser is 'merely an offer' and does not 'become a binding contract until it is approved in the Bankruptcy Court.'"); In re Lyons Transp. Lines, Inc., 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994) ("Absent actual or constructive fraud, a settlement agreement is binding as between the parties pending the required bankruptcy court approval."); In re Frye, 216 B.R. 166, 174 (Bankr. E.D.Va. 1997) (concluding that the better rule of law is found in the cases that determine the agreement is binding pending the bankruptcy court approval). Georgia courts are in accord with these cases. See Matter of Cotton, 127 B.R. 287, 290 (Bankr. M.D. Ga. 1991), aff'd, 136 B.R. 888 (Bankr.

-25-

M.D. Ga. 1992) *rev'd, on other grounds,* 992 F.2d 311 (11th Cir.1993).  In Matter of Cotton, the United States Bankruptcy Court for the Middle District of Georgia relied upon Georgia law in reaching its holding, noting that "Georgia law favors settlements and cessation of litigation," and that such a contract could be unilaterally rescinded only on grounds of actual fraud.  Id.  See also In re Tidewater Group, Inc., 8 B.R. 930, 931 (Bankr. N.D. Ga. 1981) ("The Court feels that an agreement by a debtor in possession to compromise litigation should also be binding upon all parties to the agreement pending a Court determination as to whether or not to approve the agreement.").

Netbank asserts that the Court should follow this well-reasoned line of cases.  To the extent this Court disagrees, and holds that an agreement with a trustee was not binding without court approval, NetBank has certainly adequately plead and proven a claim for tortious interference with potential business relations.  Under Georgia law, the elements for such a claim included: "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." Crane v. Albertelli, 592 S.E.2d 684, 685 (Ga. Ct. App. 2003).[12]  To the extent this Court does not consider the NetBank/Lakeland-Trustee Agreement a binding enforceable contract, it certainly should be considered a prospective business relationship with which Royal has tortiously interfered.

---

[12]     California also recognizes the tort of intentional interference with prospective economic or business relations.  See e.g., Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal.4th 376, 393 (Cal. 1995).

## 2.    Royal's Tortious Conduct Was Not Privileged.

Royal erroneously argues that its conduct in interfering with the NetBank/Lakeland-Trustee Agreement was not tortious, and that even if it was, Royal has no liability for its tortious conduct based upon the California litigation privilege.  The California litigation privilege does not apply because Georgia law governs this dispute.  Nonetheless, even if did apply, it would not protect Royal's conduct here.

As NetBank's agent, Royal had a fiduciary duty to defend NetBank's title in the bonds, and was statutorily prohibited from disputing NetBank's title to the bonds in the bankruptcy court.  See O.C.G.A. § 10-6-26.  In interfering with NetBank's agreement with the Trustee, and instead, funding the Trustee's avoidance claims against NetBank, Royal was certainly acting in a tortious and prohibited manner and breached its fiduciary duty.[13]

Moreover, Royal cannot escape liability based upon California's litigation privilege.  California's litigation privilege only covers communicative activity, and does not apply to tortious courses of conduct.  See California Civil Code § 47.  The California litigation privilege "precludes recovery for tortiously inflicted injury resulting from *publications* or *broadcasts* made during the course of judicial and quasi-judicial proceedings, but does not bar recovery for injuries from tortious *conduct* regardless of the purpose for which such conduct is undertaken."  Kimmel v. Goland, 793 P.2d 524, 525 (Cal. 1990) (emphasis in original); see Olszewski v. Scripps Health, 69 P.3d 927, 949 (Cal. 2003) ("As a general rule, the privilege applies only to communicative acts and does not privilege tortious courses of conduct.") (internal punctuation

---

[13]    Accordingly, under Georgia law, Royal's conduct was tortious. RESTATEMENT (SECOND) OF CONFLICTS § 156  ("(1) The law selected by application of the rule of § 145 determines whether the actor's conduct was tortious; (2) The applicable law will usually be the local law of the state where the injury occurred.").

omitted).  See also Silberg v. Anderson, 786 P.2d 365, 368-69 (Cal. 1990); Kupiec v. Amer. Int'l

Adjustment Co., 1 Cal. Rptr. 2d 371 (Cal. Ct. App. 1991).

## IV.    CONCLUSION

Royal's motion for partial summary judgment as to counts IV, VI, VIII, IX X and XII of

NetBank's Third Amended and Supplemental Complaint must be denied.  Royal's analysis of the

choice of law is fatally flawed, and thus its analysis of the applicable law is irrelevant.  NetBank

has properly stated and established a prima facie case for each of the counts alleged in its

complaint and through discovery.  At a minimum, genuine issues of material fact exist that

preclude the entry of summary judgment.

This 15th Day of April, 2008.


*/s/ William V. Custer*
William V. Custer
Georgia Bar No. 202910
Leeann Jones
Georgia Bar No. 402440
Jennifer B. Dempsey
Georgia Bar No. 217536
Powell Goldstein LLP
One Atlantic Center, Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
(404) 572-6600
bcuster@pogolaw.com

Robert B. Bernstein
Vandenberg & Feliu, LLP
110 East 42nd Street, Suite 1502
New York, NY 10017
(212)763-6804
rbernstein@vanfeliu.com

*Attorneys for Federal Deposit Insurance*
*Corporation as receiver for NetBank, FSB*

#1267752 IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: COMMERCIAL MONEY | ) | CASE NO. 1:02cv16000 (MDL Docket) |
| CENTER, INC., EQUIPMENT | ) | |
| LEASE LITIGATION | ) | JUDGE KATHLEEN M. O'MALLEY |
| | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| | ) | MDL No. 1:02-16010 |

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **RESPONSE OF FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR NETBANK FSB TO ROYAL INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS IV, VI, VIII, IX, X AND XII OF THE THIRD AMENDED AND SUPPLEMENTAL COMPLAINT** was filed electronically on the 15th day of April, 2008.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ William V. Custer*
William V. Custer
**POWELL GOLDSTEIN LLP**
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street NW
Atlanta, Georgia 30309-3488
(404) 572-6600
(404) 572-6999 (facsimile)
bcuster@pogolaw.com

**Appendix A**
**Supplement to NetBank's Response to Royal's Motion for Summary Judgment**

<u>**Supplement Regarding Choice of Law**</u>

Georgia Law, *not* California law, applies to NetBank's claims.

**A.     The Law Applicable to NetBank's Claims.**

Royal bases its entire argument that summary judgment should be granted in its favor on NetBank's claims for breach of fiduciary duty, bad faith, fraud, tortious interference and breach of the covenant of good faith and fair dealing on one erroneous conclusion – namely, *that California law applies to NetBank's claims.*  California law, however, simply does not apply to NetBank's claims.

No matter how the choice of law issue is analyzed – California law cannot be applied to NetBank's claims – not under Nevada's most significant relationship test, and not under Georgia's *lex loci delicti* or *lex loci contractus* choice of law rules.  To do so would ignore the contacts that courts routinely consider to be the *most important* to the parties and tort claims at issue, i.e., the location of the *injury* that occurred to the Plaintiff NetBank, which in this case is Georgia; where Royal performed its duties in bad faith and breached its fiduciary duties (North Carolina) and where the parties relationship was centered (Georgia).

Royal is correct in their argument that under federal law, a transferee court, including the MDL court, is to apply the choice of law rules that the transferor court would have applied. <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 244 , 102 S.Ct. 252, 260 (1982); <u>Rosen v. Chrysler Corp.</u>, 205 F.3d 918, 921 n.2 (6th Cir. 2000); <u>In re SmartTalk Teleservices, Inc. Securities Litigation</u>, 124 F.Supp.2d 505, 521 (S.D. Ohio 2000).  It is also clear that where an action is transferred based on improper venue, the transferor court must apply the choice of law of the

A-1

state in which it sits.  Nelson v. International Paint Co., 716 F.2d 640, 643 (9th Cir. 1983);

Martin v. Stokes, 623 F.2d 469, 471 (6th Cir. 1980).

When the present action was first transferred to Nevada from the Northern District of

Georgia, however, the Northern District of Georgia specifically noted that the sureties did not

argue that venue was improper under 28 U.S.C. § 1391, but instead, based their arguments on

independent judicial doctrines like the 'first to file' rule.  The Northern District of Georgia most

certainly made no determination that Georgia was the improper venue for the Safeco and Royal

claims even under the first to file rule.  Indeed, Safeco and Royal only moved for transfer

pursuant to 28 U.S.C. § 1404 (forum non conveniens), rather than on grounds of improper

venue.[1]  Ultimately, the Court deferred ruling on Illinois Union's motion to dismiss for improper

venue pending NetBank's consent to transfer to the District of Nevada.  Of course, NetBank

ultimately did consent to the transfer of the entire case to the District of Nevada.

Thus, it is clear that Georgia's choice of law principles should govern the analysis in this

case.  In the alternative, one can at least make an argument that Nevada choice of law principles

apply to NetBank's claims.  Under either states' choice of law principles, however, it is clear that

the laws of the *State of Georgia* apply to NetBank's claims.

**B.      Under Georgia's Choice of Law Principles, Georgia Law Applies to NetBank's Tort Claims.**

Under Georgia's choice of law principles – *lex loci delicti* – tort cases are governed by

the substantive law of the state where the tort was committed.  Ga. Farm Bureau Mut. Ins. Co. v.

Williams, 597 S.E.2d 430, 431 (Ga. Ct. App. 2004).  The Georgia Court of Appeals explained

---

[1]      Illinois Union, with whom NetBank has since settled its claims, initially moved to dismiss for improper venue; however the Court in the Northern District of Georgia deferred ruling on that motion pending NetBank's consent to the motion to transfer venue.

A-2

the application of *lex loci delicti* in <u>Risdon Enterprises, Inc. v. Colemill Enterprises, Inc.</u>, 324

S.E.2d 738, 740 (Ga. Ct. App. 1984):

> How do we determine the lex loci delicti where the tort is transitory in nature?
> The general rule is that 'the place of wrong, the locus delicti, is the place where
> the injury sustained was suffered rather than the place where the act was
> committed, or, as it is sometimes more generally put, it is the place where the last
> event necessary to make an actor liable for an alleged tort takes place.'

<u>Id.</u>  Accordingly, Georgia courts look to where the *injury* occurred, rather than where the tortious

action took place.  <u>Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.</u>,  713 F.2d 618,

621 (11th Cir. 1983) ("Georgia follows the traditional rule that in tort actions, the law of the

place of the injury – or *lex loci delicti* –governs the resolution of the substantive issues.

Therefore, the court must determine the place 'where the last act necessary to make an actor

liable for an alleged tort [took] place.'"); <u>Int'l Bus. Machines Corp. v. Kemp</u>, 536 S.E.2d 303,

306 (Ga. Ct. App. 2000) ("The 'last event' necessary to make an actor liable for fraud is the

injury, and consequently, for purposes of lex loci delicti, the place of the wrong is where that

injury is sustained."); <u>Mgmt. Science America v. NCR Corp.</u>,  765 F.Supp. 738 (N.D.Ga. 1991)

(fraud committed in state where economic loss occurred). <u>See also</u> <u>RCA Corp. v. Tucker</u>, 696

F.Supp. 845 (E.D.N.Y. 1988)(examining choice of law under the *lex loci delicti* analysis and

noting that " "the authorities are unanimous that in fraud cases where the wrongful acts occur in

a state other than that in which the injury is suffered, the case is governed by the law of the state

where the *injury or economic loss is felt*.").  (emphasis added).

    Here, NetBank's injury for Royal's breach of fiduciary duty, bad faith, tortious

interference, fraud and breach of good faith and fair dealing was sustained in Georgia where

NetBank was headquartered.  NetBank was a federally chartered savings bank with its principal

place of business in Alpharetta, Georgia. [Bowers Affidavit at ¶ 30].  At the time NetBank

invested in the CMC program, purchased the lease pools, Royal issued the replacement bonds
and assumed the duties of Amwest, CMC failed to make payments due to NetBank, and Royal
failed to honor its bonds and obligations under the SSAs, NetBank's *only* physical place of
business was in the State of Georgia. [Id.]. The injury and economic harm that NetBank
suffered because of Royal's tortious conduct occurred wholly in the State of Georgia. [Id.].
Accordingly, Georgia law applies to NetBank's tort claims under the principle of *lex loci delicti*.

C.     **Under Nevada's Choice of Law Principles, Georgia Law Applies to
       NetBank's Tort Claims.**

        Similarly, under Nevada's choice of law rules, Georgia law should be found to apply to
NetBank's tort claims against Royal.  For tort claims in Nevada, in <u>Gen'l Motors Corp. v. Eighth</u>
<u>Jud. Dist. Court of State of Nev. ex rel. County of Clark</u>,  134 P.3d 111, 116 -117 (Nev. 2006),
the Nevada Supreme Court adopted the general principles set forth in Section 145 of the
Restatement of Conflict of Laws and the  "most significant relationship test" for choice-of-law
issues.  Contacts to be taken into account in the choice of law analysis include: a) the place
where the injury occurred; b) the place where the conduct causing the injury occurred; c) the
domicile, residence, nationality, place of incorporation and place of business of the parties, and
d) the place where the relationship, if any, between the parties is centered.  <u>General Motors</u>
<u>Corp.</u>, 134 P.3d at 116-117.

        Indeed, the comments to Section 145 of the Restatement (Second) of Conflict of Laws
make it clear that the place where NetBank suffered its injuries – Georgia – plays an important
role in this analysis.

> In the case of personal injuries or of injuries to tangible things, the place where
> the injury occurred is a contact that, as to most issues, plays an important role in
> the selection of the state of the applicable law.  This contact likewise plays an
> important role in the selection of the state of the applicable law in the case of
> other kinds of torts, provided that the injury occurred in a single, clearly

ascertainable, state.  This is so for the reason among others that persons who
cause injury in a state should not ordinarily escape liabilities imposed by the local
law of that state on account of the injury.

RESTATEMENT (SECOND) CONFLICT OF LAW, § 145, comment e.  These comments demonstrate,

that in this case, the place where NetBank suffered financial harm as a result of Royal's torts

plays an important role in the selection of the state of applicable law.

While there is little case law interpreting Nevada's analysis of the most significant

relationship test, in Nevada, like many other states applying the most significant relationship

choice of law analysis, the location of where the *injury* occurred is considered a key

determination.  See Emke v. Company, LLC, 2007 WL 2781661 (N.D. Tex. Sept. 25,

2007)(considering Nevada's choice of law principles for a case transferred from Nevada and

noting that under the 'most significant relationship test,' a key determination is "where the injury

occurred.").  See also Horowitch v. Diamond Aircraft Industries, Inc., 526 F. Supp.2d 1236

(M.D. Fla. 2007) (in examining the most significant relationship test: "[t]he state where the

injury occurred would, under most circumstances, be the decisive consideration in determining

the applicable choice of law."); Spence v. Glock, 227 F.3d 308 (5th Cir. 2000) (in evaluating

class certification in an economic loss case, the court determined that it was most likely that the

law of 51 different jurisdictions applied because injury occurred in all 51 jurisdictions).

Royal, of course, attempts to direct the Court's attention to California law by focusing on

the actions of *CMC* and *Michael Anthony*, rather than place of injury, or even the place of

Royal's conduct.  Such an analysis is misplaced where the place of injury can be readily

ascertained and bears an enormous impact on the parties and claims at issue.  See e.g.,

RESTATEMENT (SECOND) CONFLICT OF LAWS § 145, comment e.  These comments demonstrate

A-5

that, in this case, the place where NetBank suffered financial harm as a result of Royal's tort plays an important role in the selection of the state of applicable law.

Accordingly, because NetBank's injury occurred wholly in the State of Georgia, under Nevada's most significant relationship test, Georgia law applies to NetBank's tort claims against Royal.

**D.     Even if this Court Considers NetBank's Claim for Bad Faith Based Upon Royal's Role as a Surety to be a Contract Claim, Georgia Law Applies**

Even if this Court considers NetBank's claim for bad faith based upon Royal's role as a surety to be a contract claim, that claim is still governed by the law of the State of Georgia, as the place where the surety contracts *between Royal and NetBank* were "made." Federal Ins. Co. v. National Distributing Co., Inc., 203 Ga.App. 763, 767, 417 S.E.2d 671, 674 - 675 (1992).  In Federal Ins. Co., the court noted:

> Learned scholars have pointed out that insurance contracts often have no particular place where performance is contemplated. Thus, it appears reasonable to apply the law of the place where the contract was made.  Stated more precisely: 'The insurance contract is constructively made at the place where the contract is delivered.
>
> . . .
>
> The contract was made in Georgia, because that is "where the last act essential to the completion of the contract was done," and where it was *made* controls.

Id.  Georgia law is clear that the last essential act for an insurance contract is where the contract was delivered.  Accordingly, where the contract was delivered – Georgia – is where the contract was *made*.  Id.  Howard v. Doe,  330 S.E.2d 370, 371 (Ga. Ct. App. 1985) ("Under [the] Georgia [conflict of laws rule] the place of the delivery of the insurance contract controls.").

In its quest to apply California law to NetBank's claims, Royal may argue that California law should govern because the bonds were "made" in California when they were issued by

Safeco's agent Anthony & Morgan and delivered to CMC's office in Escondido, California. The delivery of the bonds to CMC is not the relevant consideration here, instead, the relevant consideration is where the bonds, which were issued to protect NetBank, were delivered to NetBank. Indeed, not only were the bonds delivered to NetBank in the State of Georgia, [See Dowling Deposition, dated 7/2/03, at p. 261, 264; and 7/3/03 at pp. 64-65], the SSA expressly required at closing, the delivery of the bonds to NetBank [See SSA at ¶ 2.7(g)][2]. Moreover, the Royal Lease Bond contains the following provision: "[J]urisdiction regarding this bond shall rest in the State of the Obligee." Having assumed the obligations of Amwest under the Amwest SSAs and, in accordance therewith, having delivered the original bonds to NetBank in Georgia, it follows inexorably that jurisdiction regarding the bond rests in the State of Georgia and that, accordingly, NetBank's punitive damage claims for bad faith and breach of the covenant of good faith and fair dealing should be decided under the laws of Georgia.

As set forth above, the claims at issue here are tort claims that should be governed by the laws of the state where the injury occurred (Georgia). Regardless of the construction of the claims, however, one thing is clear – California law does not apply. Since Royal's Motion for Summary Judgment is based *entirely* upon its erroneous assertion that California law applies, the Motion should be denied, as Royal has not asserted that it would be entitled to summary judgment under the laws of Georgia.

---

[2]       SSA 2.7(g) ("The Seller [CMC] shall deliver to the Purchaser [NetBank] evidence, reasonably satisfactory to the Purchaser, of (A) the filing of all financing statements required under this Agreement…(B) a letter from the Surety Company [Safeco] acknowledging the valid issuance and delivery of the Surety Bonds. (sic)(C) the *original of each executed Surety Bond* with Power of Attorney and Notary attached, (D) and Opinion of Counsel and (E) a copy of each Lease.").