IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| IN RE:  COMMERCIAL MONEY CENTER, INC. EQUIPMENT LEASE LITIGATION | MDL Docket No. 1:02-16000 Hon. Kathleen M. O'Malley This Document Relates to 02-16010 |

ROYAL INDEMNITY COMPANY'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
AGAINST NETBANK, FSB ON COUNTS IV, VI, VIII, IX, X AND XII
OF NETBANK'S THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
Chicago, IL  60606
Phone:  (312) 876-8000
Fax:  (312) 876-7934
        *and*
1221 Avenue of the Americas
New York, NY  10020-1089
Phone:  (212) 768-6700
Fax:  (212) 768-6800

SPIETH, BELL, MCCURDY & NEWELL
925 Euclid Avenue - Ste. 2000
Cleveland, OH 44115
Phone:  (216) 696-4700
Fax: (216) 696-2706

*Attorneys for Royal Indemnity Company*

May 15, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................................II

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 4

A. CALIFORNIA LAW—NOT GEORGIA LAW—APPLIES TO NETBANK'S TORT CLAIMS. ................... 4

    1. Because NetBank's Claims Were Required To Be Made as Compulsory Counterclaims in an Action Filed in the District of Nevada, This Court Must Apply Nevada's Choice of Law Rules. ................................................................................. 4

    2. Under Nevada's Choice Of Law Rules, the Law of California—Which Has the "Most Significant Relationship" With this Matter—Applies To NetBank's Tort Claims.................................................................................................................... 7

B. ROYAL SHOULD BE GRANTED SUMMARY JUDGMENT DISMISSING COUNT IV (FRAUD OR NEGLIGENT MISREPRESENTATION) AND COUNT VIII (PROMISSORY ESTOPPEL) BECAUSE NETBANK CANNOT DEMONSTRATE THAT IT RELIED ON ANYTHING THAT ROYAL SAID OR DID. ................................................................................................................................... 8

    1. The Chronology of Events Negates Any Claim That NetBank Relied On Any Actions or Representations of Royal When NetBank Purchased (Or Made Loans Relating To) CMC Lease Pools............................................................................... 9

    2. NetBank's Claim That It "Retained" Its CMC Lease Pools in Reliance on the Royal Bonds is Legally Insufficient and Unsupported By Any Record Evidence. ...................... 10

    3. If There Were a Factual and Legal Basis to NetBank's Claim That It "Retained" the CMC Lease Pools In Reliance On the Royal Bonds, Its Damages Would Be Limited To The Sales Price It Would Have Received Had It Sold the Pools (Less What It Already Has Received)........................................................................... 14

C. ROYAL IS ENTITLED TO SUMMARY JUDGMENT DISMISSING COUNT VI (BREACH OF FIDUCIARY DUTY), COUNT IX (BAD FAITH) AND COUNT X (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING) . ........................................................................................ 16

D. ROYAL IS ENTITLED TO SUMMARY JUDGMENT DISMISSING COUNT XII (TORTIOUS INTERFERENCE WITH CONTRACT) BECAUSE THERE WAS NO VALID, ENFORCEABLE AGREEMENT BETWEEN THE CHAPTER 7 TRUSTEE AND NETBANK WITH WHICH ROYAL COULD HAVE INTERFERED. ................................................................................................. 18

CONCLUSION................................................................................................................................ 22

# TABLE OF AUTHORITIES

## CASES

*Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*, 272 F. Supp. 2d 482 (E.D. Pa. 2003) ...................................................................................................7

*Amzak Corp. v. Reliant Energy, Inc.*, No. 03 C 0877, 2004 WL 1882482 (N.D. Ill. Aug. 19, 2004) .............................................................................................14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................................13

*Athens Heart Center, P.C. v. Brasstown Valley Resort, Inc.*, 275 Ga. App. 607, 621 S.E.2d 565 (Ga. App. 2005) ..................................................................................19

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ........................................11

*Britt/Paulk Insurance Agency v. Wandroff Insurance Agency*, 952 F. Supp. 1575 (N.D. Ga. 1996) ............................................................................................ 20-21

*California Joint Powers Insurance Authority v. Munich Reins. America, Inc.*, No. CV 08-956, 2008 WL 1885754 (C.D. Cal. April 21, 2008) .............................................16

*Cates Construction, Inc. v. Talbot Partners*, 980 P.2d 407 (Cal. 1999) ...........................16

*Coe v. State Farm Mutual Automobile Insurance Co.*, 66 Cal. App. 3d 981, 136 Cal. Rptr. 331 (Cal. Ct. App. 1977) .......................................................................19

*Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995) ..........................................................13

*Engalla v. Permanente Medical Group*, 15 Cal. 4th 951, 64 Cal. Rptr. 2d 843, 938 P.2d 903 (Cal. 1997) .......................................................................................15

*In re Frye*, 216 B.R. 166 (Bankr. E.D. Va. 1997).............................................................19

*In re Fortran Printing, Inc.*, 297 B.R. 89 (Bankr. N.D. Ohio 2003) ................................19

*Fottler v. Moseley*, 60 N.E. 788 (Mass. 1901)..................................................................14

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004) ........................18, 21

*Gordon v. Buntrock*, No. 00 CV 303, 2000 WL. 556763 (N.D.Ill. Apr. 28, 2000)...........14

*Harris v. Distinctive Builders, Inc.*, 249 Ga. App. 686, 549 S.E.2d 496 (Ga. App. 2001) ...................................................................................................20

*Kimmel v. Goland*, 793 P.2d 524 (Cal. 1990)...................................................................21

*Koerner v. Aetna U.S. Healthcare, Inc.,* 92 Fed. Appx. 394 (9th Cir. 2003) ...................15

*Laverson v. Macon Bibb County Hospital Authority*, 487 S.E.2d 621 (Ct. App. Ga. 1997) ........................................................................................................................17

*Meinhold v. Sprint Spectrum, L.P.*, No. 2:07-cv-0456, 2007 WL. 2904003 (E.D. Cal. Oct. 2, 2007) ......................................................................................................9

*Moore v. Buiso*, 235 Ga. 730, 221 S.E.2d 414 (Ga. 1975) ................................................19

*Rogers v. Cisco Systems, Inc.*, 268 F. Supp. 2d 1305 (N.D. Fla. 2003)...................... 10-11

*Seideman v. Sheboygan Loan & Trust Co.*, 198 Wis. 97 (1929) .......................................14

*Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293 (7th Cir. 1993).........................................12

*Small v. Fritz*, 65 P.3d 1255 (Cal. 2003) ............................................................. 10-12, 14

*Strother Ford, Inc. v. Bullock*, 142 Ga. App. 843 (Ga. App. 1977)....................................9

*Stuart Enterprises International, Inc. v. Peykan, Inc.*, 555 S.E.2d 881 (Ct. App. Ga. 2001) ........................................................................................................................17

*Tucker v. Union of Needletrades, Industrial & Textile Employees*, 407 F.3d 784 (6th Cir. 2005) ..............................................................................................................18, 21

*Voyles v. Sasser*, 221 Ga. App. 305, 472 S.E.2d 80 (Ga. App. 1996) .............................20

*Williams v. UMG Recordings, Inc.*, No. CV-01-03135, 2006 WL. 1307922 (9th Cir. May 12, 2006).............................................................................................................20

*Wolfe v. Village of Brice*, 37 F. Supp. 2d 1021 (S.D. Ohio 1999)....................................12

*In re Worldcom, Inc. Securities Litigation*, 336 F. Supp. 2d 310 (S.D.N.Y. 2004)..... 11-12

### STATUTES

28 U.S.C. § 1404.................................................................................................................6

### OTHER AUTHORITIES

Restatement (Second) Conflict of Laws § 6 .......................................................................8

Restatement (Second) Conflict of Laws § 145 ............................................................... 7-8

**ROYAL INDEMNITY COMPANY'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
AGAINST NETBANK, FSB ON COUNTS IV, VI, VIII, IX, X AND XII
OF NETBANK'S THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

Defendant Royal Indemnity Company ("Royal") respectfully submits this Reply

Memorandum in further support of its Motion for Summary Judgment ("Motion") against NetBank,

FSB ("NetBank") on NetBank's claims for fraud/negligent representation (Count IV), breach of

fiduciary duty (Count VI), promissory estoppel (Count VIII), bad faith (Count IX), breach of

implied covenant of good faith and fair dealing (Count X), and tortious interference with contract

(Count XII) as set forth in NetBank's Third Amended and Supplemental Complaint (the

"Complaint").[1]

## INTRODUCTION

In granting Royal leave to seek summary judgment dismissing the six claims that are

addressed in this reply memorandum, this Court recognized the prospect that each claim could be

resolved as a matter of law, because no disputed facts were material to Royal's proposed Motion.

(Order dated December 19, 2007, 02-16000, Doc. 2138 at 33-40.)  NetBank's opposing papers only

confirm the accuracy of Royal's recitation of the core undisputed facts, which negate each of these

claims:

---

[1] Royal's Motion and supporting Memorandum relating to Counts IV, VI, VIII, IX, X, and XII of NetBank's Complaint were filed on February 15, 2008.  (02-16010, Docs. 63 and 65 ("Royal 2/15/08 Mem." or "Royal's 2/15/08 Memorandum").)  Royal's 2/15/08 Memorandum was supported with a two-volume set of exhibits and other materials filed under seal.  (02-16010, Doc. 64 ("Royal Ex. ___").)

Later, on February 25, 2008, pursuant to leave granted by this Court, Royal separately moved for summary judgment on all remaining counts of NetBank's Complaint—Counts I, II, III and VII.  (02-16010, Docs. 66 ("Royal 2/25/08 Motion") and 67 ("Royal 2/25/08 Mem." or "Royal's 2/25/08 Memorandum").)

On April 15, 2008, NetBank filed a response to Royal's 2/15/08 Motion and Memorandum (02-16010, Doc. 68 ("NetBank 4/15/08 Resp.").)

On April 18, 2008, NetBank filed a response to Royal's 2/25/08 Motion and Memorandum (02-16010, Doc. 70 ("NetBank 4/18/08 Resp.").)

Concurrent with this brief, Royal is filing a separate reply memorandum in support of Royal's 2/25/08 Motion  ("Royal 5/15/08 Mem. re: Counts I, II, III and VII").

- The undisputed chronology negates NetBank's allegations (in Counts IV and VIII) that its decision to "purchase" the CMC lease pools was made in reliance upon the issuance of the Royal Bonds.  Royal had no involvement whatsoever in any of the NetBank-CMC transactions until after NetBank had made its last purchase from (or loan to) CMC.  A party cannot rely upon an event that has not yet taken place—and is not even in anyone's contemplation at the time of the supposed "reliance."  (Royal 2/15/08 Mem. at 2-3.)  For obvious reasons, NetBank does not even attempt to rebut this dispositive point.  (NetBank 4/15/08 Resp. at 15.)

- There is no evidence in a record of hundreds of deposition days and hundreds of thousands of pages of documents to support NetBank's allegation (made solely in Count IV, but not in Count VIII) that it "retained" its interest in the CMC lease pools in reliance upon receiving the Royal Bonds in January 2001.  Nor is there record evidence that NetBank ever considered selling, much less could have sold its interest in the lease pools—unless NetBank is suggesting that it would have sold its interest without telling the purchaser the true facts about CMC about which NetBank was fully aware by December 2000, thus defrauding the purchaser.  All that NetBank can muster is to cite Riverway Bank's sale of lease pools to GECC to show that such a sale was possible, and to offer an affidavit of a then-officer of NetBank to state that he "would have" considered such a sale.  Omitted is the fact that the only reason Riverway was able to sell its pools to GECC is that Riverway did not tell GECC the true facts about CMC—and, as a result, GECC sued Riverway for fraud in an action that was part of this MDL proceeding.  And the former NetBank officer's statements, seven years after the fact, of his own purported state of mind, are not sufficient to establish that NetBank would have sold its CMC interests even if it had been able to do so.  (*Id.* at 15-16.)

- Even if there were a factual basis for NetBank's claim (Count IV) that it "retained" the lease pools in reliance on the Royal Bonds, NetBank's damages cannot exceed $2.9 million.  NetBank fails to submit any evidence (because the record contains none) that, if Royal had declined to issue bonds (and therefore NetBank supposedly would have sold its CMC interests because it did not have the Royal Bonds to rely upon), the sale price would have been any greater than what has actually been collected on those CMC lease pools.  (*Id.* at 17.)  NetBank received all of those collections—except for $2.9 million.  Therefore, even if there could be a "retention" claim, NetBank's damages could not exceed $2.9 million.

- NetBank premises its claims against Royal on commercial surety bonds and commercial contracts which, under California law, cannot support claims for breach of fiduciary duty, bad faith, or breach of a covenant of good faith and fair dealing (Counts VI, IX, and X). Recognizing the potentially dispositive import of these principles of California law, NetBank argues that Royal was NetBank's agent, and that fiduciary and good faith duties arose from that agency relationship.  But NetBank neglects to note that while it is now on its Third Amended Complaint, none of its pleadings have attempted to ground these claims in an agency relationship.  (*Id.* at 17-19, 22-24.)

- The original proposed settlement agreement between NetBank and the Chapter 7 Trustee in *In Re Commercial Money Center, Inc*., Bankruptcy No. 02-09721 (*Richard Kipperman, Chapter 7 Trustee v. NetBank, FSB*, Adv. No. 03-90331-JH) (Bankr. S.D. Cal.) ("Chapter 7 Trustee" or "Trustee") was not a binding contract because it was subject to approval of the Bankruptcy Court—and that Court never approved that proposed agreement.  That undisputed fact negates NetBank's "tortious interference with

contract" claim (Count XII).  NetBank does not, and could not, submit any contrary evidence.

Unable to rebut these dispositive facts, NetBank prefaces its memorandum with a discussion of issues that are not material to Royal's Motion—such as consideration that was given to creation of a reinsurance company, which never went forward.  While NetBank's recitation is filled with misstatements, because none of those extraneous "fact" issues has any bearing on the matters before this Court, Royal will not respond.  They simply are not germane to the legal issues identified in this Court's Order granting leave to move for summary judgment.

NetBank also attempts to avoid summary judgment by arguing that Georgia, rather than California, law should apply.  (*Id.* at 14; App. A.)  NetBank is wrong; under the "most significant relationship" test, all of NetBank's tort claims are governed by California law.  But even if Georgia law did apply, Royal still would be entitled to summary judgment dismissing all of these claims.

## ARGUMENT

**A.  CALIFORNIA LAW—NOT GEORGIA LAW—APPLIES TO NETBANK'S TORT CLAIMS.**

**1.  Because NetBank's Claims Were Required To Be Made as Compulsory Counterclaims in an Action Filed in the District of Nevada, This Court Must Apply Nevada's Choice of Law Rules.**

In Appendix A to Royal's 2/15/08 Memorandum, Royal demonstrated that Nevada's choice of law rules applied to this action and that, under those rules, the substantive law of California properly applies to NetBank's tort claims ("Royal's Choice of Law Appendix").  (Royal 2/15/08 Mem. App. A.)  In response, NetBank concedes that "one can at least make the argument that Nevada choice of law principles apply" (NetBank 4/15/08 Resp. at A-2), but argues that Georgia choice of law principles should govern.  NetBank is not only plainly wrong when it claims that Georgia choice of law should apply, but its argument is based on a misrepresentation of the ruling

of the United States District Court for the Northern District of Georgia ("Georgia federal court"), which led to the transfer of NetBank's claims from that court to the United States District Court for the District of Nevada ("Nevada federal court").

As explained in Royal's Choice of Law Appendix, the original CMC-related action relevant to the choice of law analysis was filed in Nevada federal court, where NetBank (among others) was named as a counterclaim defendant.[2]  NetBank subsequently filed a separate action against Royal and others in Georgia state court.[3]  After removing NetBank's Georgia state court action to Georgia federal court[4], Royal and others moved to dismiss NetBank's Georgia action for improper venue on the grounds that NetBank's claims were compulsory counterclaims in the action previously filed in Nevada federal court, and violated the first-to-file rule, or, alternatively, for transfer of the case. (See July 16, 2002 Order, N.D. Ga., attached hereto as Royal Ex. 55.)

The Georgia federal court, in a thorough opinion, explicitly found that the claims that NetBank had made in its action filed in Georgia state court, which were removed to Georgia federal court, were compulsory counterclaims that NetBank was required to file (if at all) in the action previously filed in Nevada federal court:

> In conclusion, the court does not find that this case involves circumstances which merit a departure from the compulsory counterclaim or first-to-file rules.  Therefore, the court finds that the instant [Georgia] action and the [Nevada] Action substantially overlap and [the Georgia Action] "must be dismissed, stayed or transferred and consolidated."

(Royal Ex. 55 at 22-23 (citation omitted).)  The Georgia federal court then analyzed whether it

---

[2] *Commercial Money Center, Inc. v. Illinois Union Insurance Co.*, No. 2:01-cv-0685-RLH-LRL (D. Nev.), filed on June 13, 2001; NetBank named as counterclaim defendant on August 10, 2001.  (D. Nev. Case No. 2:01-cv-0685-RLH-LRL, Docs. 1 (Complaint) and 7 (Counterclaim).)

[3] *NetBank v. Commercial Money Center, Inc. et al.*, No. 2002-CV-48221 (Ga. Sup. Ct.), filed on January 28, 2002.  (*See* 02-16010, Doc. 1, attach. 2 thereto at 1-2 and exhibit A (discussing State of Georgia action and attaching First Amended Complaint).)

[4] *NetBank v. Commercial Money Center, Inc. et al.*, No. 02-CV-984 (N.D. Ga.), notice of removal from Georgia state court filed on April 15, 2002. (02-16010, Doc 1, attach. 2 thereto.)

could, pursuant to 28 U.S.C. § 1404, transfer the Georgia action to Nevada and found that it could not.  (*Id.* at 25 ("the court has concluded that transfer is unwarranted under section 1404(a). . . ").)  The Georgia federal court gave NetBank ten days to consent to transfer to Nevada and held:

> If NetBank does not file timely consent to transfer, this action with be
> DISMISSED WITHOUT PREJUDICE so NetBank may refile this
> action in the District of Nevada.

(*Id.* at 25 (emphasis in original).)

NetBank's statements in its Response to Royal's Motion that the Georgia federal court "deferred ruling on [the] motion to dismiss for improper venue pending NetBank's consent to transfer to the District of Nevada" is wrong and highly misleading.  (NetBank 4/15/08 Resp. at A-2.)  The Georgia federal court explicitly found that NetBank's claims were not properly brought in Georgia in the first instance, and should have been filed in Nevada as compulsory counterclaims.  The Georgia federal court ruled that ***NetBank's Georgia action would be dismissed unless NetBank agreed to transfer.***  Contrary to NetBank's representation to this Court, when NetBank consented to the transfer, NetBank well knew that if it did not so consent, the Georgia action would be dismissed; the decision on the motion to dismiss had not been "deferred."  Under those conditions—where a party violates the compulsory counterclaim rule to engage in second-to-file forum shopping—the forum-shopping party is not entitled to be rewarded by being permitted to invoke the choice-of-law rules of the state where the wrongful second filing took place.  (*See* Royal 2/15/08 Mem. App. at 1-2 (where forum transfer driven by violation of compulsory counterclaim rule, choice of law rules of improper forum do not apply) (citations omitted).)

The action in Nevada federal court was, of course, later consolidated in this MDL Court.  Therefore, this MDL Court—which is obliged to apply the choice of law rules that would be applied by the transferor court—must apply the choice of law rules of Nevada, not Georgia.  (Royal 2/15/08 Mem. App. at 1-2.)

- 6 -

**2.      Under Nevada's Choice Of Law Rules, the Law of California—Which Has the "Most Significant Relationship" With this Matter—Applies To NetBank's Tort Claims.**

NetBank does not dispute that Nevada (like Ohio) has adopted the Restatement (Second) of Conflict of Laws § 145's "most significant relationship" test for determining what substantive law applies.  (*See* Royal 2/15/08 Mem. App. at 4-5; NetBank 4/15/08 Resp. at A-4.)  Nor does NetBank dispute that the transactions at issue were centered in California.  However, NetBank claims that the place of injury "bears an enormous impact" on choice of law and that, since NetBank claims that it was injured in Georgia, Georgia law should apply.  (NetBank 4/15/08 Resp. at A-5.)  Here, too, NetBank misstates both the law and the undisputed facts.

Place of injury is but one of the factors in the Nevada "most significant relationship" analysis, but that factor is not dispositive, or even always important, and it must be considered in light of the other factors.  Restatement (Second) Conflict of Laws § 145 comment f (place of injury important in case of personal injuries or injury to tangible things but is less significant in the case of fraudulent misrepresentations).  Here, where NetBank is claiming purely financial damages and not injury to a person or thing, the place of injury carries minimal weight:

> [Plaintiff] contends that, because the injury is financial in nature, it occurred at the plaintiff's principal place of business . . . .  Even if true, this would not determine the outcome of our analysis because it is only for "injuries to tangible things" that "the place where the injury occurred is the contact that, as to most issues, plays an important role in the selection of applicable law."  Restatement, § 145, cmt. E (1971).  ***When the injury is purely financial, this factor loses significance***.

*Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*, 272 F. Supp. 2d 482, 502 (E.D. Pa. 2003) (emphasis added).  Indeed the location where a financial injury was sustained has even less relevance here, because "Net.B@nk," as NetBank spelled its name in the CMC transactions (Compl. Exs. 19-25), was, as NetBank's then Chief Financial Officer Robert Bowers states, "a new

type of bank in that it did business with its customers almost exclusively over the internet." (Affidavit of Robert Bowers ("Bowers Aff.") at ¶ 21 (02-16000, Doc. 2175).)  If the location of NetBank's back-office and administration in Georgia was of little, if any, significance to NetBank's business—conducted "almost exclusively over the internet"—it is hard for NetBank to argue that it should be the decisive factor in a choice-of-law analysis of the "most significant relationship."

Further, Royal never acted in Georgia in the CMC transactions.  The parties' relationship was indisputably centered in California—where CMC was based, where NetBank officers visited CMC, where Royal representatives separately met with CMC, where bonds in Royal's name were issued and from where those bonds purportedly were assigned, and where the funds on CMC's leases were collected and paid to NetBank.  (*See* Royal 2/15/08 Mem. App. at 4.)  California is the one state in which each of NetBank and Royal (as well as the remaining parties in these MDL proceedings) chose to act—and therefore the state whose law the parties could justifiably expect would apply to their relationship.  "[T]he protection of justified expectations," Restatement 2d Conflict of Laws § 6(2)(d), is one of the basic choice of law principles to be considered when conducting an analysis under Section 145.  Restatement (Second) Conflicts of Laws § 145(1) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in §6").

**B.**     **ROYAL SHOULD BE GRANTED SUMMARY JUDGMENT DISMISSING COUNT IV (FRAUD OR NEGLIGENT MISREPRESENTATION) AND COUNT VIII (PROMISSORY ESTOPPEL) BECAUSE NETBANK CANNOT DEMONSTRATE THAT IT RELIED ON ANYTHING THAT ROYAL SAID OR DID.**

NetBank's fraud or negligent misrepresentation claim (Count IV) and promissory estoppel claim (Count VIII) each fail because the undisputed facts negate any claim of "reliance"—a necessary element of each of those claims.

1.      **The Chronology of Events Negates Any Claim That
NetBank Relied On Any Actions or Representations of
Royal When NetBank Purchased (Or Made Loans
Relating To) CMC Lease Pools.**

In Royal's 2/15/08 Memorandum, Royal showed that, as a matter of simple chronology,

NetBank could not have relied on any actions or representations of Royal when NetBank purchased

(or made loans relating to) its CMC lease pools, because NetBank entered into all of those

transactions before Royal first became involved with CMC.  NetBank does not dispute this issue,

focusing solely on its allegation (in Count IV, but not in Count VIII) that it "retained" its interest in

the CMC lease pools in reliance on the Royal Bonds.  (NetBank 4/15/08 Resp. at 15.)

The timing of Royal's involvement in CMC—without more—entitles Royal to summary

judgment dismissing NetBank's promissory estoppel claim (Count VIII).  That Count is based

solely on an allegation that NetBank relied upon Royal in making its decision to purchase the CMC

lease pools, and makes no allegations about a decision "to retain" its interests.  That same fact

should lead to the dismissal of NetBank's fraud/negligent misrepresentation claim (Count IV) to the

extent it relates to NetBank's original decision to invest in (or make loans relating to) the CMC

lease pools.  The analysis and the result on this issue are the same under California and Georgia

law.  *Meinhold v. Sprint Spectrum, L.P.*, No. 2:07-cv-0456, 2007 WL 2904003, *4 (E.D. Cal. Oct.

2, 2007) (applying California law) ("Plaintiff's change in position must necessarily occur after

defendant's alleged misrepresentation. . . . [P]laintiff's conduct occurred prior to the alleged

misrepresentations in her bills. As such, plaintiff's actions could not have been conducted in

reliance on the defendant's written statements in her bills."); *Strother Ford, Inc. v. Bullock*, 142 Ga.

App. 843, 844-45 (Ga. App. 1977) (holding that where the defendant's alleged misrepresentation

was "made after the execution of the sales contract, [it] did not induce [the plaintiff's] reliance," and

thus the plaintiff's fraudulent misrepresentation claim fails as a matter of law).

For the additional reasons below, the fraud/negligent misrepresentation claim should be dismissed in all respects.

> **2.      NetBank's Claim That It "Retained" Its CMC Lease Pools in Reliance on the Royal Bonds is Legally Insufficient and Unsupported By Any Record Evidence.**

In Royal's 2/15/08 Memorandum, Royal analogized NetBank's retention claim to securities "holder" actions, in which a plaintiff claims that it held—as opposed to purchased or sold—a security based on alleged conduct or representations of the defendant.  (Royal 2/15/08 Mem. at 17-18.)  NetBank does not contest that its action is analogous to a holder action, but argues that courts have only rejected, or applied stringent standards to, "holder actions" when brought as class actions. (NetBank 4/15/08 Resp. at 16-17.)  NetBank is wrong.  NetBank has not identified either (1) a single jurisdiction that prohibits "class" holder actions but permits individual holder actions or (2) a single jurisdiction, among those that permit holder actions, which applies different standards to individual actions than to class actions.

California is among the few states that permit holder actions.  However, California (and those other few states) requires a heightened level of pleading and proof to compensate for the risk that non-meritorious cases will be brought where—as is intrinsic in holder actions—there may well be no contemporaneous documentary evidence.  In actions based on a sale or purchase, there invariably is such evidence, at least as to the fact and date of the sale or purchase.   In *Small v. Fritz*, 65 P.3d 1255 (Cal. 2003), the California Supreme Court held:

> In a holder's action a plaintiff must allege specific reliance on the defendants' representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status, the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place. ***The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations.***

*Id.* at 1265 (emphasis added).  *See also Rogers v. Cisco Systems, Inc.*, 268 F. Supp. 2d 1305 (N.D.

Fla. 2003) (applying *Small v. Fritz* standard to "holding claim" under Florida law and finding that

plaintiff's vague allegations of retention failed to meet that standard).

If Georgia law were to apply (as NetBank claims), it would be less favorable to NetBank.  In

*In re Worldcom, Inc. Securities Litigation,* 336 F. Supp. 2d 310, 318-19 (S.D.N.Y. 2004)

("*Worldcom*"), the United States District Court for the Southern District of New York held:

> Georgia has never recognized a cause of action for 'holders' of
> securities and, in the face of the strong policy reasons against
> recognition of such a claim, and the weight of authority in other
> jurisdictions either rejecting or severely limiting such a claim, there is
> no basis to predict that it will do so.

*Id.*  Relying on the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S.

723, (1975), which disallowed all holder actions under federal securities laws, the *Worldcom* court

warned of the potential of plaintiffs bringing non-meritorious holder actions merely to extract

settlements.  The Court explained that since reliance in holder actions is based entirely upon a

plaintiff's self-serving claims of retention and not on verifiable documentation, recognition of

holder actions would open the floodgates to frivolous and vexatious litigation, thus imposing an

unacceptable burden on courts to sort through conjecture, speculation, and "hazy issues of historical

fact."  Accordingly, most courts have followed the Supreme Court's decision in *Blue Chip Stamps*

and have rejected holder actions outright under state common law.

Whether California's "heightened pleading" requirement for holder action applies, or

whether the Georgia prohibition on holder actions (as found by the *WorldCom* court) applies,

NetBank's retention claim fails.  When this Court granted Royal leave to move for summary

judgment, the Court noted the absence of "factual allegations" in the Complaint to support

NetBank's retention claim:

> Although NetBank has alleged, in conclusory form, that it relied on
> representations made by Royal in deciding to <u>retain</u> the lease pools,
> NetBank's complaint contains no factual allegations that would
> support such an assertion.

- 11 -

(02-16000, Doc. 2138 at 35 (emphasis in original).)  With a full evidentiary record, it is clear that not only are there no "factual allegations" to support NetBank's retention claim, there are no facts— and certainly not sufficient facts to meet the heightened pleading requirement under California law.

NetBank does not point to any record evidence that it ever considered disposing of its interest in CMC in December 2000—not a page from the hundreds of thousands of pages of documents produced in the comprehensive discovery supervised by this Court, and not an answer from the hundreds of days of deposition testimony.  In violation of the heightened pleading and proof standards for holder actions, NetBank has not alleged any "actions" that it took on that score. NetBank has offered only the "unspoken and unrecorded thoughts and decisions" of Robert Bowers, who had been an officer of NetBank at the time of the CMC transactions, in an affidavit created specifically to oppose Royal's Motion, suggesting what NetBank would have or could have done had the Royal Bonds not been issued.  *Small v. Fritz*, 65 P.3d 1255 (Cal. 2003).  The Bowers Affidavit contains the very type of self-serving, conclusory, and speculative statements that are insufficient to meet California's heightened proof and pleading standards, and that caused the *WorldCom* court to conclude that Georgia would not permit holder actions at all.

In his affidavit, Bowers states that if Royal had not agreed to issue the bonds "NetBank *would have* taken other steps to insure its investment" and "*would have* sought bonds from another surety for the lease pools bonded by Amwest."  (Bowers Aff. at ¶ 20 (emphasis added).)  But this is self-serving, after-the-fact speculation (unexpressed at the time), not evidence.  *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993) ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment.  [A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.") (internal quotation marks and citations omitted); *Wolfe v. Village of Brice*, 37 F. Supp. 2d 1021, 1026 (S.D. Ohio 1999) ("Self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment.")

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)).

Moreover, at his deposition, Bowers testified to the contrary, admitting that NetBank had no "contingency plan in mind" if Royal did not confirm the issuance of its Bonds.  (Royal Ex. 5 at 84-85.)  That testimony negates NetBank's glib argument that the absence of any record evidence to support NetBank's "retention" claim is the fault of Royal's counsel who, NetBank argues, "did not bother to adequately question NetBank in depositions about its reliance."  (NetBank 4/15/08 Resp. at 15.)

Bowers also speculates that, at some unspecified time, NetBank "*would have*" sold an unspecified amount of its interests in CMC lease pools to some unspecified buyer, at some unspecified, though admittedly discounted, price.  (Bowers Aff. at ¶ 21.)  To support Bower's speculation that NetBank would have sold its interests in the CMC lease pools, NetBank argues that "other investors had successfully sold their lease pools and there was no reason that NetBank could not do so as well.  (NetBank 4/15/08 Resp. at 15.)  The only other such investor identified by NetBank is Riverway Bank.  Riverway did sell its interest in CMC to GECC, but GECC was willing to buy only because Riverway did not tell GECC the true facts about the CMC lease pools.  As a result, GECC sued Riverway for fraud—in one of the actions that was consolidated in this MDL Court.  (02-16006, Doc. 4 at ¶¶ 115-212.)  GECC alleged, among other things, that Riverway was aware—but failed to tell GECC—that "many of the leases in the lease pools were in default and would likely result in deficient payments to GE Capital."  (*Id.* at ¶ 119.)  The claims between GECC and Riverway were settled.  (*See*, *e.g.*, 02-16006, Doc. 59.)

NetBank thus appears to argue that if NetBank had not received the Royal Bonds in January 2001, NetBank might have sold its interests in CMC lease pools, without disclosing what it knew about CMC (including what it learned from its work with the Office of Thrift Supervision

immediately prior thereto)—just as Riverway did.  NetBank's supposed buyer is not only

unspecified, but would have had to be unsuspecting.

This is not evidence sufficient to meet the heightened requirements for pleadings and proof

in a holder action, and falls far short of the evidence found sufficient by those courts that permit

holder actions.  *See, e.g., Fottler v. Moseley,* 60 N.E. 788 (Mass. 1901) (cited in NetBank 4/15/08

Resp. at 17) (holder action allowed where evidence that plaintiff gave broker sell order on a specific

day (March 25, 1893) to sell stock at specific price that plaintiff then canceled based on broker

misrepresentations); *Seideman v. Sheboygan Loan & Trust Co.,* 198 Wis. 97 (1929) (cited in

NetBank 4/15/08 Resp. at 17)  (holder action allowed where plaintiff attempted to return bonds to

seller per contract and seller induced plaintiff to keep bonds).[5]

> ### 3. If There Were a Factual and Legal Basis to NetBank's Claim That It "Retained" the CMC Lease Pools In Reliance On the Royal Bonds, Its Damages Would Be Limited To The Sales Price It Would Have Received Had It Sold the Pools (Less What It Already Has Received).

If there were evidence to support (and a legal basis for) NetBank's "retention" theory,

NetBank's damage claim would be limited to the sales price that it would have received for the

lease pools had it not "retained" its interests in those pools based on the Royal Bonds—less the

lease collections that it actually has received as a result of continuing to hold its interest in the

pools.  It obviously would not have received those collections had it sold its interests.

In its 2/15/08 Memorandum, Royal documented that, if the Royal Bonds had not been issued

to supplement the worthless Amwest bonds, and if NetBank had thus sold what would have been, in

---

[5] NetBank's assertion that *Gordon v. Buntrock,* No. 00 CV 303, 2000 WL 556763 (N.D. Ill. Apr. 28, 2000) is in "direct conflict with Royal's parenthetical list of states that reject [holder] claims" is wrong.  (NetBank 4/15/08 Resp. at 17.)  Illinois does not recognize holders actions.  *Amzak Corp. v. Reliant Energy, Inc.*, No. 03 C 0877, 2004 WL 1882482, at *6 fn.3 (N.D. Ill. Aug. 19, 2004) ("[N]o Illinois case has recognized the 'holder action' allowed in the *Small* [*v. Fritz*] case.").  *Gordon* was decided under Delaware law and stands only for the proposition that a cause of action based on a holder theory cannot form the basis for removal of an action to federal court.

effect, unbonded pools, the greatest sales price that NetBank conceivably could have hoped to receive would have been equal to the actual lease collections under those pools.  Since NetBank has received all of those lease collections except for $2.9 million paid to the Chapter 7 Trustee and Royal pursuant to the Global Settlement Agreement in the bankruptcy proceedings, NetBank's damages are limited to $2.9 million.  (Royal 2/15/08 Mem. at 20.)

In response, NetBank complains that Royal is "ignoring the existence of the bonds issued to protect NetBank's investment."  (NetBank 4/15/08 Resp. at 17.)  But NetBank's retention claim, by definition, is based on what NetBank claims it would have done had the Royal Bonds not been issued—that is, that NetBank would have sold its CMC interest (with the worthless Amwest bonds but not the Royal Bonds) if NetBank did not have the Royal Bonds upon which to rely.  As such, all the pools were worth is what was ultimately collected on them.

In its response to Royal's Motion, NetBank was obliged to submit not only whatever evidence it had that it would have and could have sold the lease pools, but also whatever evidence it had as to what sales price it would have received.  *Koerner v. Aetna U.S. Healthcare, Inc.,* 92 Fed. Appx. 394 (9th Cir. 2003) (affirming summary judgment dismissing fraud claim, where plaintiff failed to submit admissible evidence of damages, because "fraud claim requires proof of damages arising out of misrepresentation," *citing Engalla v. Permanente Med. Group,* 15 Cal. 4th 951, 64 Cal. Rptr. 2d 843, 938 P.2d 903, 917 (Cal. 1997)).  NetBank has submitted no such evidence. Absent such evidence, even if NetBank's holder claim were viable, NetBank's damages would be limited to $2.9 million.  Thus, if this Court allows NetBank to proceed to trial on its "retention" theory, this Court should enter an order holding that NetBank's claim cannot, as a matter of law, exceed $2.9 million.

**C.**    **ROYAL IS ENTITLED TO SUMMARY JUDGMENT DISMISSING COUNT VI (BREACH OF FIDUCIARY DUTY), COUNT IX (BAD FAITH) AND COUNT X (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING).**

Whether California or Georgia law applies, Royal is entitled to summary judgment dismissing Count VI (Breach Of Fiduciary Duty), Count IX (Bad Faith) and Count X (Breach Of Covenant of Good Faith and Fair Dealing).

*First,* if California law applies, NetBank does not seriously contest that its breach of fiduciary duty, breach of covenant of good faith and fair dealing, and bad faith claims must be dismissed under *Cates Constr., Inc. v. Talbot Partners*, 980 P.2d 407 (Cal. 1999), which plainly holds that a surety is not a fiduciary, and that a party, such as NetBank, which claims to be an obligee under a surety bond, cannot assert a cause of action for bad faith against a surety.[6]  (Royal 2/15/08 Mem. at 21.)  Likewise, California law does not recognize a tort of breach of the covenant of good faith and fair dealing in the surety context (*id.* at 22-23).

*Second,* whether California or Georgia law applies, each of these claims is premised on NetBank having rights under the Royal Bonds.  (02-16010, Doc. 23 at ¶¶ 137 (fiduciary duty under Amwest SSAs and "performance bonds"); 150 (bad faith for refusing "to honor . . .  obligations

---

[6] While NetBank attempts to limit *Cates* to "construction performance bonds" (NetBank 4/15/08 Resp. at 21 n.8), *Cates* is not so limited, as Royal demonstrated in its 2/15/08 Memorandum at 23-25.

  Indeed, on April 21, 2008, the United States District Court for the Central District of California, applying *Cates,* held that that the California Supreme Court would not extend tort liability to a reinsurer's alleged breach of the implied covenant of good faith and fair dealing (*i.e.*, the tort of bad faith) for failure to pay. *California Joint Powers Ins. Auth. v. Munich Reins. Am., Inc.*, No. CV 08-956, 2008 WL 1885754 (C.D. Cal. April 21, 2008).  In so doing, the court exhaustively examined the various factors upon which the California Supreme Court relied in *Cates* when it found that such tort liability does not extend beyond the traditional insurer-insured relationship to a surety's failure to pay under a commercial surety bond.  The court concluded that the same policy considerations that militated against extending tort liability to the commercial surety bond context—including the fact that "elements of adhesion and unequal bargaining power are generally absent", that permitting a bad faith claim was not necessary to protect the public interest, and that there is no fiduciary relationship (*id.* at 3-4)—similarly warranted not extending tort liability to the reinsurance context. Based on *Cates*, *California Joint Powers*, and the arguments in Royal's 2/15/08 Memorandum, NetBank's policy arguments regarding *Cates* (NetBank 4/15/08 Resp. at 21 n.8 (incorporating NetBank's Safeco Response)) must be rejected.

under the Performance Bonds"); 157 (breach of good faith and fair dealing for failing to indemnify NetBank under "Performance Bonds").)  However, as a result of the Final Judgment entered in the Bankruptcy Court, that assumption is not true:  In fact, NetBank has no rights under the Royal Bonds.  This issue is reviewed in detail in Royal's 2/25/08 Motion and Royal's 2/25/08 Memorandum, as well as in Royal's 5/15/08 Memorandum on Counts I, II, III, and VIII.  Under the Final Judgment entered in the Bankruptcy Court, NetBank's claims to the Royal Bonds were voided *ab initio*—*i.e.*, as if NetBank's rights in the Royal Bonds had never been conveyed in the first place. Royal cannot have fiduciary and good faith duties, or be accused of bad faith, for failing to perform actions which, in the absence of the Royal Bonds, Royal had no duty to perform.  *See Laverson v. Macon Bibb County Hosp. Auth.*, 487 S.E. 2d 621, 623 (Ct. App. Ga. 1997) (without contract there is no remedy for breach) (citation omitted); *Stuart Enters. Int'l., Inc. v. Peykan*, *Inc.,* 555 S.E. 2d 881, 884 (Ct. App. Ga. 2001) (duty of good faith and fair dealing is not independent of contract and is not an independent cause of action).

*Third,* NetBank's related argument that Royal was NetBank's agent, and that an agent owes fiduciary and good faith duties to a principal, also fails, whether California or Georgia law applies. Neither in its original Complaint, nor its Second Amended Complaint, nor its Third Amended Complaint has NetBank ever grounded these claims on an allegation that Royal was NetBank's agent.  Count VI (Fiduciary Duty) and Count X (Good Faith and Fair Dealing) do not allege that those duties exist because Royal was NetBank's agent under the SSAs.  (02-16010, Doc. 23 at ¶¶ 137 (Royal had fiduciary duty as "Servicer under the [Amwest SSAs] and the Performance Bonds"); 156 (covenant of good faith and fair dealing implied "in every surety agreement and insurance policy").)  Indeed, nowhere in its Complaint does NetBank allege that Royal was NetBank's agent, even when describing Royal's purported role as "Servicer" under the Amwest

SSAs.  (02-16010, Doc. 23 at ¶ 31 (describing Servicer role and alleging that CMC was Royal's agent, ***but not that Royal was NetBank's agent***).)

NetBank cannot now, after the deadline for amending pleadings has come and gone long ago, raise, for the first time in opposition to summary judgment, new causes of action based on a purported agency relationship between NetBank and Royal.  *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (non-moving party cannot raise new claims in response to summary judgment motion); *Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1314 (11th Cir. 2004) (holding that the liberal pleading standard "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage").  Moreover, since the only basis for NetBank's belated agency claim is the Amwest SSAs (NetBank 4/15/08 Resp. at 18), the Final Judgment negates these claims as well, because the Final Judgment voided any interest of NetBank in the leases and Royal Bonds *ab initio,* and the Amwest SSAs have no independent existence in the absence of leases and bonds.

**D.    ROYAL IS ENTITLED TO SUMMARY JUDGMENT DISMISSING COUNT XII (TORTIOUS INTERFERENCE WITH CONTRACT) BECAUSE THERE WAS NO VALID, ENFORCEABLE AGREEMENT BETWEEN THE CHAPTER 7 TRUSTEE AND NETBANK WITH WHICH ROYAL COULD HAVE INTERFERED.**

Royal's 2/15/08 Memorandum demonstrated as a matter of law that the original proposed NetBank/Lakeland-Trustee agreement was not an enforceable contract.  That proposed agreement on its face provided that performance under the agreement was "subject in all respects to approval of the California Bankruptcy Court."  (Royal 2/15/08 Mem. at 26.)  Further, the entire context of bankruptcy presumes that trustees will, and even should, enter into multiple contingent contracts in order to maximize estate proceeds.  (*Id.* at 27.)

In response, NetBank does not dispute or distinguish the law Royal cited, but argues that some courts have held that settlement agreements subject to bankruptcy court approval are still

binding agreements "pending bankruptcy court determination about whether or not to approve the agreement."[7]  (NetBank 4/15/08 Resp. at 25.)  NetBank's argument and cases have no relevance here.  The split of authority about which NetBank argues relates to whether, ***in contracts lacking a specific provision dictating that contract performance is contingent on bankruptcy court approval***, the contracts are enforceable ***pending*** bankruptcy court approval.  (*Id.*)  *See, e.g., In re Fortran Printing, Inc.*, 297 B.R. 89, 96 (Bankr. N.D. Ohio 2003) (holding settlement agreement binding absent approval where "[n]o provision of the negotiated settlement made the parties' assent subject to court approval"); *In re Frye*, 216 B.R. 166 (Bankr. E.D. Va. 1997) (discussing approval of oral agreement by bankruptcy court).  Here, it is undisputed that the agreement in question contained express provisions that it was subject to approval of the bankruptcy court.[8]

Under California law (which applied to the proposed NetBank/Lakeland-Trustee agreement) or Georgia law (which NetBank claims applies), the proposed NetBank/Lakeland-Trustee agreement was not a binding agreement because it was expressly conditioned upon approval by the California Bankruptcy Court, a condition that was never satisfied.  *Moore v. Buiso*, 235 Ga. 730, 731, 221 S.E.2d 414, 415 (Ga. 1975) ("Where a contract is contingent on the meeting of some condition, it is not enforceable by either party until the condition has been met."); *Athens Heart Center, P.C. v. Brasstown Valley Resort, Inc*. 275 Ga. App. 607, 608, 621 S.E.2d 565, 566 (Ga. App. 2005) (same); *Coe v. State Farm Mut. Auto. Ins. Co.*, 66 Cal. App. 3d 981, 992, 136 Cal. Rptr.

---

[7] While NetBank invokes Georgia law in its discussion of its tortious interference claim, Georgia law has even less of a relationship to this claim than NetBank's other tort claims.  All the actions about which NetBank complains in Count XII took place in California under the jurisdiction of the United States Bankruptcy Court for the Southern District of California, and the proposed NetBank/Lakeland-Trustee agreement was expressly governed by California law.  Even if the Court were inclined to apply Georgia law to NetBank's other tort claims, California law still would apply to Count XII.

[8]  See Ex. 37 at ¶¶ 2 ("The effectiveness of this Agreement is subject in all respects to approval of the California Bankruptcy Court."); ¶ 18 ("The Trustee's obligation to perform under this Agreement is expressly conditioned solely on (a) entry of the Approval Order by the California Bankruptcy Court … ."); ¶ 19 ("NetBank's and Lakeland's obligation to perform under this Agreement is expressly conditioned solely on (a) entry of the Approval Order by the California Bankruptcy Court . . . .").

331, 337 (Cal. Ct. App. 1977) ("[W]hen the approval of a third party is necessary for a contract to take effect, there is no contract until such approval has been obtained.").

Likewise, under the law of both states, where there is no binding contract, there is no claim for "tortious interference with contract." *Harris v. Distinctive Builders, Inc.*, 249 Ga. App. 686, 690, 549 S.E.2d 496, 500 (Ga. App. 2001) (granting defendant's summary judgment motion and holding that "[i]f there is no contract, there can be no tortious interference with it"); *Voyles v. Sasser*, 221 Ga. App. 305, 305, 472 S.E.2d 80, 82 (Ga. App. 1996) ("In the absence of a valid and enforceable contract, summary judgment [on claim for tortious interference with contract] is appropriate"); *Williams v. UMG Recordings, Inc.*, No. CV-01-03135, 2006 WL 1307922, at *1 (9th Cir. May 12, 2006) (same) (applying California law).

In addition, prior to any Bankruptcy Court ruling on whether the original proposed NetBank/Lakeland-Trustee agreement should be approved, NetBank/Lakeland and the Trustee withdrew that proposed agreement, and instead entered into an Amended and Restated NetBank/Lakeland-Trustee Agreement (limited to lease pools bonded by sureties or insurers other than Royal).  That Amended and Restated NetBank/Lakeland-Trustee Agreement was approved by the Bankruptcy Court.  It cannot be disputed that (1) the Amended and Restated NetBank/Lakeland-Trustee Agreement is the only enforceable agreement between NetBank and the Trustee, (2) NetBank has received the full benefits of that Amended and Restated NetBank/Lakeland-Trustee Agreement, and (3) NetBank does not contend that Royal interfered with the Amended and Restated NetBank/Lakeland-Trustee Agreement.

Recognizing the weakness of its tortious interference with contract claim, NetBank argues alternatively that it has established all of the elements of a claim under Georgia law for tortious interference with potential business relations.  (NetBank 4/15/08 Resp. at 26.)  However, this is a distinct and separate cause of action that NetBank never pleaded in its Complaint.  *See Britt/Paulk*

*Ins. Agency v. Wandroff Ins. Agency*, 952 F. Supp. 1575, 1581 (N.D. Ga. 1996) ("Under Georgia law, tortious interference with business relations is a distinct and separate tort from that of tortious interference with contractual relations."). A non-moving party may not raise new claims in response to a summary judgment motion, *Tucker*, 407 F.3d at 788; *Gilmour*, 382 F.3d at 1314 (holding that the liberal pleading standard "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage"), and NetBank is prohibited from doing so here. Moreover, any claim of "tortious interference with potential business relations" would be inconsistent with, and barred by, the operation of bankruptcy law. A bankruptcy trustee, who has an obligation to maximize the assets of the estate, could not possibly do so if a creditor or other party, by objecting to a proposed agreement submitted by the bankruptcy trustee for bankruptcy court approval, or by proposing an alternative agreement, would thereby subject itself to liability for "tortious interference with potential business relations."

Finally, NetBank claims that Royal's conduct in the California Bankruptcy Court is not protected by the litigation privilege provided by California law. Again, NetBank argues for the application of Georgia law—but offers no legal or logical basis why Georgia law should dictate whether the California litigation privilege should apply to a litigation conducted in California.

NetBank's substantive challenge to the scope of California's litigation privilege—arguing that it is limited to "communicative acts" only (NetBank 4/18/08 Resp. at 27)—does not remove Royal's actions in the bankruptcy proceeding from the scope of that privilege. "[T]he litigation privilege . . . has been interpreted to apply to virtually all torts except malicious prosecution." *Kimmel v. Goland*, 793 P.2d 524, 527 (Cal. 1990) (citations omitted) (cited by NetBank at NetBank 4/15/08 Resp. at 27). Royal's objections to the proposed agreement between NetBank/Lakeland and the Trustee, and Royal's proposing an alternative agreement to the Trustee, are well within the scope of California's litigation privilege.

## CONCLUSION

For all of the reasons set forth above and in Royal's other memoranda, this Court should enter summary judgment dismissing all of the counts of NetBank's Complaint.

Dated:  May 15, 2008

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

By: /s/  Steven L. Merouse

John I. Grossbart
*jgrossbart@sonnenschein.com*
Steven L. Merouse
*smerouse@sonnenschein.com*
Anne W. Mitchell
*amitchell@sonnenschein.com*
7800 Sears Tower
Chicago, IL  60606
Phone:  (312) 876-8000
Fax:  (312) 876-7934

SPIETH, BELL, MCCURDY & NEWELL CO, L.P.A.

Timothy G. Warner (0062144)
*twarner@spiethbell.com*
925 Euclid Ave.
Ste. 2000
Cleveland, OH  44115
Phone:  (216) 696-4700
Fax:  (216) 696-2706

Michael H. Barr
*mbarr@sonnenschein.com*
Richard M. Zuckerman
*rzuckerman@sonnenschein.com*
1221 Avenue of the Americas - 23rd Floor
New York, NY  10020-1089
Phone:  (212) 768-6700
Fax:  (212) 768-6800

*Attorneys for Royal Indemnity Company*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2008, a copy of the foregoing

**ROYAL INDEMNITY COMPANY'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
AGAINST NETBANK, FSB ON COUNTS IV, VI, VIII, IX, X AND XII
OF NETBANK'S THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

/s/ Steven L. Merouse

John Grossbart
*jgrossbart@sonnenschein.com*
Steven L. Merouse
*smerouse@sonnenschein.com*
7800 Sears Tower
Chicago, IL  60606
Phone:  (312) 876-8000
Fax:  (312) 876-7934

Michael H. Barr
*mbarr@sonnenschein.com*
Richard M. Zuckerman
*rzuckerman@sonnenschein.com*
1221 Avenue of the Americas
24th Floor
New York, NY  10020-1089
Phone:  (212) 768-6700
Fax:  (212) 768-6800

*Attorneys for Royal Indemnity Company*

10021975\V-12